**David W. FERRIS, O.D., David G. Wright, O.D., Mark Blasbalg, O.D., and David Mills, O.D., individually and on behalf of all others similarly situated; Rhode Island Optometric Association; and John W. Tardiff, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**GENERAL DYNAMICS CORPORATION, Defendant.**

C.A. No. 85–0669 S.

United States District Court, D. Rhode Island.

Oct. 8, 1986.

Mosca & Mosca, Angelo A. Mosca, Jr., Aisenberg & Jones, Martin W. Aisenberg, Providence, R.I., for plaintiffs.

Edwards & Angell, Matthew F. Medeiros, Judith C. Savage, Providence, R.I., for defendants.

## OPINION AND ORDER

SELYA, District Judge.

After it became apparent that the instant parties could not see eye to eye as to the meaning and intendment of a state statute and its impact (if any) upon the operations of General Dynamics Corporation (GDC), this civil action was commenced in the state court on September 23, 1985. GDC thereafter seasonably removed the case to this court in pursuance of 28 U.S.C. § 1441. The removing defendant claimed to have a double toehold on the slippery slope of federal jurisdiction; its removal petition adverted to both diversity jurisdiction, 28 U.S.C. § 1332, and federal question jurisdiction. 28 U.S.C. § 1331.

Although no immediate motion to remand was filed, the plaintiffs raised the question of this court's subject matter jurisdiction, ergo the propriety of the removal, at a Fed.R.Civ.P. 16 status/scheduling conference held before the district judge to whom the case was originally assigned in this court. The judge, quite properly, ordered that all matters be held in abeyance pending resolution of the threshold issues as to jurisdiction.

The plaintiffs promptly moved to remand the case to the state superior court. The defendant objected. Following the filing of exegetic briefs, the litigation was coincidentally transferred to the calendar of the undersigned district judge as part of a reorganization of assignments ancillary to the installation of a newly-appointed district judge. This court heard oral argument on August 21, 1986 and thereafter entertained supplemental briefing. This rescript comprises the court's findings and conclusions as to the issues sub judice.

## I. AN EYEWITNESS ACCOUNT

The starting point for this analysis rests in a more precise description of the case which confronts the court. The instant action seeks equitably to enforce, via injunctive relief, a state statute, R.I.Gen. Laws § 40.1–3–15, which provides in pertinent part:

> Notwithstanding any provisions of a policy or contract of group accident, group health, group accident and health insurance or the provisions of any private accident and health insurance policy, whenever such policy or contract provides for reimbursement for any optometric service which is within the lawful scope of practice of a duly licensed optometrist, a subscriber to such group accident, group health, group accident and health, or the provisions of any private accident and health insurance policy or contract shall be entitled to reimbursement for such service, whether the said service is performed by a physician or duly licensed optometrist.

The plaintiffs allege that GDC has discriminated against optometrists—and continues so to discriminate—in blatant disregard of what the Rhode Island General Assembly, in the passage of § 40.1–3–15, has ordained. The defendant has worked this wrong, the plaintiffs say, by incorporating certain benefit restrictions in both (i) the collective bargaining agreement (Agreement) entered into between the defendant and the Metal Trades Council (the labor organization representing many of the workers at the defendant's Groton, Connecticut facility), and (ii) the self-funded health and welfare plan (Plan) applicable to defendant's non-union employees at Groton and at Quonset Point, Rhode Island.[1] The defendant, it should be noted, employs approximately 20,000 persons at Groton (many of whom are Rhode Island residents and many of whom routinely avail themselves of Rhode Island providers for the furnishing of health care) and roughly 5000 or more at its Quonset Point site.

---

1. The Agreement and the Plan provide substantially identical benefits vis-a-vis eye care. The precise language of the instruments need not be recited verbatim. The parties to this case agree that both contracts obligate the defendant, as employer, to reimburse 80% of the costs of bi-annual eye examinations for covered employees (and their eligible dependents), so long as such examinations are performed by opthalmologists or oculists. The language plainly excludes reimbursement for like examinations conducted by optometrists.

The instant plaintiffs purport to represent two separate classes. More particularly, the plaintiffs Ferris, Wright, Blasberg, and Mills are all optometrists; they seek to represent a class consisting of all optometrists licensed by, and practicing in, Rhode Island. Plaintiff Tardiff toils in the defendant's vineyard. He offers himself as the representative of a further class, comprising all employees of GDC who are patients of Rhode Island optometrists. The remaining plaintiff, the Rhode Island Optometric Association, is a trade association of Rhode Island optometrists. The plaintiffs complain jointly that the actions of the defendant, though undertaken pursuant to the letter of the Agreement and Plan, *see ante* n. 1, transgress the clear mandate of R.I.Gen.Laws § 40.1–3–15 by reimbursing employees in substantial part for the costs of bi-annual eye examinations performed by ophthalmologists or oculists, but not those performed by optometrists.

It is undisputed that, in the first quarter of 1986, employees at defendant's Quonset Point facility submitted eye care claims totalling $9,920.96. GDC disclaimed responsibility for over 35% of these claims—$3781.40—as being beyond the coverage of the Plan. On the basis of standard sampling techniques (the accuracy of which has not been challenged), it is estimated that some 98% of the dollar value of the disallowed claims can be attributed to charges for optometric services, the bulk of which originated in Rhode Island. It is likewise clear that GDC spurned these claims solely because the Plan precluded reimbursement for any expense associated with eye care examinations conducted by optometrists.

## II. EYEING THE ISSUES

In response to the bifocal nature of GDC's outlook on federal jurisdiction, the motion to remand has two faces. The first issue posed by the competing contentions of the parties is whether or not the plaintiffs' complaint "arises under" the laws of the United States, notwithstanding the fact that, when filed in the state superior court (and now), it complained only of the supposed violation of a state statute.

If such "federal question" jurisdiction, 28 U.S.C. § 1331, does not exist, GDC nonetheless sees itself as remaining in the hunt. The defendant has alternatively invoked this court's diversity jurisdiction, 28 U.S.C. § 1332, and the parties are admittedly citizens of different states for diversity purposes.[2] Yet, the motion to remand posits a nice question concerning the appropriate computation of the amount in controversy, a necessary integer of the diversity equation. *See* 28 U.S.C. § 1332(a).

The court will examine these issues separately, recognizing that if either "federal question" or "diversity" jurisdiction is found to exist, then the analysis need proceed no further and the plaintiffs' remand initiative must be rejected. It is only in the absence of any sort of federal jurisdiction that the case may be, as the plaintiffs prefer, returned to the state tribunal.

## III. JURISDICTIONAL REDEMPTION BY FEDERAL PREEMPTION

On its face, the plaintiffs' complaint in this matter is a model of straightforwardness. It contains one count and one count only. That count is simple, direct, and unequivocal: it seeks specific enforcement of R.I.Gen.Laws § 40.1–3–15 in respect to GDC's implementation of both the Plan and the Agreement. In short, the thrust of the complaint is fashioned solely on state law grounds.

■ Nothing daunted, the defendant urges that things are not always what they seem. GDC contends that, notwithstanding the austere language and stripped-down nature of the complaint, this court possesses federal question jurisdiction pursuant to 28 U.S.C. § 1331, on the thesis that the cause of action asserted is one "arising under the Constitution, laws, or treaties of the United States." And, as the

---

**2.** The plaintiffs are each and all citizens of Rhode Island. GDC, on the other hand, is a Delaware corporation which maintains its principal place of business in St. Louis, Missouri. There is no suggestion that any member of the proposed classes, *see ante* at 1357, is a citizen of either Delaware or Missouri.

defendant correctly observes, the court must look behind and beyond the plaintiffs' selfserving characterization of their ostensible cause of action in determining whether or not the claim "arises under" federal law. The jurisdiction of the federal district courts cannot be manipulated by the simple expedient of creative labelling.

■ The traditional taproot for any federal question jurisdictional analysis is the "well pleaded complaint" rule. This dogma holds that a claim "arises under" federal law, so as to establish federal question jurisdiction, only when the plaintiffs' own statement of their cause of action demonstrates that it is based upon federal law. *See Gully v. First National Bank,* 299 U.S. 109, 112–13, 57 S.Ct. 96, 97–98, 81 L.Ed. 70 (1936); *Louisville & Nashville Railroad v. Mottley,* 211 U.S. 149, 153, 29 S.Ct. 42, 43, 53 L.Ed. 126 (1908). The well pleaded complaint rule is not, however, to be applied in a rigid and inflexible manner. Most importantly, the rule is not blind to the need to take a host of possibilities into account—possibilities which run the gamut from lack of pleading artistry, to oversight, and on to deviousness. As the Supreme Court has noted, "it is an independent corollary of the well pleaded complaint rule that a plaintiff may not defeat removal by omitting to plead necessary federal questions in a complaint." *Franchise Tax Board v. Construction Laborers Vacation Trust,* 463 U.S. 1, 22, 103 S.Ct. 2841, 2853, 77 L.Ed.2d 420 (1983).

Yet, the prophylaxis of the rule is double edged. Although plaintiffs cannot factitiously avoid federal jurisdiction by the simple expedient of remaining silent in place of acknowledging necessary ingredients of their statements of claim, neither can defendants artificially confer federal jurisdiction by verbalizing elements of their response and labelling those elements as a part of the plaintiffs' cause of action. In this case, GDC runs afoul of this cutting edge: it attempts artificially to inseminate the complaint with seeds from a foreign field. And in so doing, the defendant stands the language of *Franchise Tax Board* on its head.

The defendant argues that *Franchise Tax Board* mandates a bi-level examination of a complaint in order to determine the presence/absence of federal questions. At the ground level, the court would inquire into what the plaintiffs claimed; at the second story, the court would inquire into what should have been claimed. And, GDC exhorts, once such a dual-level perscrutation is made in this case, it becomes readily evident that, notwithstanding their disclaimers, the plaintiffs' remonstrances "arise under" federal law.

The architecture of the defendant's argument may look pleasing to the eye of the casual observer, but it is as rickety as a house built upon the shifting sands. It lacks any solid foundation. The "second level" of GDC's analytic modality—the level at which the party sued is given carte blanche constructively to rewrite its opponent's pleading—spins well outside of any accepted precedential orbit.

The fallacy of GDC's position is perhaps best illustrated by close scrutiny of its assertions. The defendant declaims that the plaintiffs' suit "arises under" federal law by arguing that it is preempted by one or the other (or both) of a brace of federal statutes: the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, and/or the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.* Thus, the anatomy of these preemption claims must briefly be described.

Initially, GDC points out that § 301 of the LMRA applies to all

> [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce ... or between any such labor organizations.

29 U.S.C. § 185.

Starting with this premise, and with the fact that the Supreme Court has indicated that it will not take a restrictive view of who may sue for a § 301 violation, *see, e.g., Schneider Moving and Storage Company v. Robbins,* 466 U.S. 364, 104 S.Ct. 1844, 1846–47 & n. 2, 80 L.Ed.2d 366 (1984); *Smith v. Evening News Association,* 371

U.S. 195, 199, 83 S.Ct. 267, 269, 9 L.Ed.2d 246 (1962), GDC urges that the plaintiffs' suit must be found to be preempted by the LMRA.

The defendant's ERISA argument is constructed in a similar manner. Because ERISA comprehensively regulates employee pension and welfare plans if they are established and maintained "by any employer engaged in commerce or in any industry or activity affecting commerce," 29 U.S.C. § 1003(a)(1), and since ERISA's private right of action, 29 U.S.C. § 1132(a), is broad enough to apply to the instant plaintiffs, then (so GDC says) their cause of action is preempted by ERISA. To sum up these contentions, the defendant's bottom line is that LMRA occupies the field with respect to controversies related to collective bargaining agreements, that ERISA does the same vis-a-vis disputes related to covered health and welfare plans, and that, in consequence of this pervasive "occupation," the plaintiffs' claim is wholly preempted by federal law. In GDC's line of sight, that conclusion more than satisfies the monition of 28 U.S.C. § 1331 that the plaintiffs' case "arises under" federal law.

To reach this result, of course, the defendant is compelled to insist that the existence of what its distinguished counsel enjoy calling "field preemption" invariably requires a finding that any claim so preempted thereby "arises under" federal law. The chief problem with this ipse dixit is that it is entirely incorrect. Preemption of the genre which, in the defendant's view, allegedly infects this case will not suffice, in and of itself, to support federal question jurisdiction. The claim of the instant plaintiffs, for example, plainly arises under state law. GDC's argument that the state law is preempted by LMRA and/or ERISA at best anticipates a defense; it does not alter the fundamental character of the plaintiffs' suit nor does it suffice to transmogrify a state law claim into a federal claim.

The First Circuit put a helpful gloss on *Franchise Tax Board* in *Hernandez-Agosto v. Romero-Barcelo*, 748 F.2d 1 (1st Cir. 1984) (per curiam). In that case, the court of appeals noted that even though the complaint at issue in *Franchise Tax Board* "itself revealed that the sole issue in the case was whether federal pension law preempted the state law on which the plaintiff rested its claim ... [,] it did so [according to the Supreme Court] by way of anticipating a *defense.*" *Id.* 463 U.S. at 3, 103 S.Ct. at 2843 (emphasis in original).

There is no more reason here than in *Franchise Tax Board* for viewing the "federal issue" as if it formed part of plaintiffs' cause of action rather than a defense to that cause of action. Indeed, there may be less. In *Franchise Tax Board,* the Court held that the plaintiff, a state agency, asserted a claim under state law (and only state law) [3] when it sued for money held by a federally regulated pension fund. 463 U.S. at 13–14, 103 S.Ct. at 2848. The ERISA preemption argument, more plausibly asserted in *Franchise Tax Board* than in this setting, did not so inform the complaint as to change its character for purposes of removal jurisdiction. *Id.* The preemption claim was no more than a cognizable potential defense, and could be raised as such. *See Hernandez-Agosto,* 748 F.2d at 3.

As in *Franchise Tax Board,* the suit at bar is based on state law and only state law. The cause of action limned in the plaintiffs' complaint does not seek to sue on a right that exists under, or should be brought by way of, federal law. And, therein lies the rub. A suit that seeks relief by way of a state statute, when the relief sought is itself provided by an all-encompassing (and exclusionary) federal statute, is preempted by the federal statute; such a suit, in fact, "arises under" federal law. But, when the relief sought is not in any sense the product of a federal statute (such as when, in the archetypical case, the

---

**3.** The plaintiff's claim in *Franchise Tax Board* was under a state tax statute. Cal.Rev.& Tax Code Ann. § 18818 *et seq.* (West Supp.1983).

redress is available only under state law), the case necessarily "arises under" state law and not federal law. Even though the state-sponsored relief may be arguably—even probably—barred by the federal statute which crowds the field, the preemption argument must be raised as a matter of defense and cannot provide a lever to engineer the creation of federal jurisdiction.

GDC's argument that R.I.Gen.Laws § 40.1-3-15, as applied in this setting, has been preempted by LMRA, or ERISA, or both, may or may not be valid.[4] That is not the point. What matters is that the argument, once stated, does not constitute a hook upon which federal jurisdiction can be hung. The preemption thesis, in the circumstances at bar, comprises merely a defense to the state court suit—no more, no less. It is by no means redemptive of the federal jurisdiction which GDC fancies.

To be sure, what the defendant has termed "field preemption" (perhaps more appropriately thought of in this context as "removal preemption") can in other circumstances be a viable doctrine. If this were a case, say, where a state law claim was substantially dependent upon an analysis of the terms of a collective bargaining agreement, a cogent argument could be made that the claim should be treated as a LMRA § 301 claim for jurisdictional purposes. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 1911, 85 L.Ed.2d 206 (1985). But, that is not the case before this court. No analysis of the terms of the Agreement is necessary. Indeed, these litigants, who here agree on little else, are unanimous in acknowledging that optometric services are not covered by the reimbursement provisions of the Agreement. *See ante* n. 1. The union pact is a known constant; it does not need to be interpreted. It needs only to be measured against the force of law—state law, as pleaded in the plaintiffs' complaint. The fact that federal preemption may be waiting in the wings is relevant to the merits of GDC's defense, but not to the jurisdictional calculus.

Much the same orchestration governs the ERISA "field preemption" initiative. It strikes only a glancing blow. There is no doubt as to the signification or intendment of the Plan's terminology—it simply does not provide for reimbursement anent optometric services. Because the meaning of the Plan is not at issue, ERISA preemption (though conceivably available as a defense to the suit) cannot be said so to infiltrate the complaint as to create the necessary jurisdictional nexus. *See Avco Corp. v. Machinists*, 390 U.S. 557, 561, 88 S.Ct. 1235, 1237, 20 L.Ed.2d 126 (1968).

Whether or not LMRA or ERISA will operate to preempt the application of R.I. Gen.Laws § 40.1-3-15 to a firm in GDC's circumstances is an open issue—but an issue for another time (and, if no federal jurisdiction exists, for another court). At the moment, this court cannot look beyond the question of whether this is a situation where the well pleaded complaint rule requires anticipated federal law issues to be read into the body of the plaintiffs' pleading. Put another way, the question is whether the plaintiffs have omitted to plead necessary federal questions. *Hernandez-Agosto*, 748 F.2d at 3. Howsoever phrased, the query must be answered in the negative.

As mentioned above, the meaning of neither the Agreement nor the Plan are in issue. Rather, the essence of the plaintiffs' complaint is the viability of these arrangements, as they are admittedly phrased, in the face of R.I.Gen.Laws § 40.-1-3-15. Viewed in the proper analytic framework, therefore, the second stage inquiry as to whether or not the state statute will survive the supposed preemptive effects of the LMRA/ERISA double whammy is a matter of GDC's defense. Accordingly, the well pleaded complaint rule prevails. The suit, objectively scanned, does not "arise under" federal law in the requisite jurisdictional sense, and the claim of removal jurisdiction derivative from 28 U.S.C. § 1331 was improvidently voiced.

---

**4.** This court has no occasion at this time to decide whether or not the plaintiffs' claims are preempted by federal law, and declines to offer any advisory opinion on the subject.

## IV. TRULY DIVERSE OR MERELY PERVERSE

The absence of federal question jurisdiction is, of course, not dispositive of the instant motion to remand. As noted previously, GDC has a reserve arrow in its quiver: it argues that diversity jurisdiction exists, 28 U.S.C. § 1332, adequate independently to support removal of the cause. Diversity jurisdiction has two components: the dispute must be between citizens of different states (a condition which is plainly fulfilled here, *see ante* n. 2) and there must be more than $10,000 in controversy, exclusive of interest and costs.[5] It is this aspect of the jurisdictional requirement which is hotly disputed here.

What is really at issue is the appropriate methodology by which compliance with the amount in controversy benchmark should be calculated. The plaintiffs assert that their claims cannot be aggregated to climb over the jurisdictional threshhold. And, they say, no individual plaintiff has a claim worth as much as $10,000, so the requisite amount is not in controversy. GDC's answer to this imprecation is twofold. First, it asseverates that it is permissible to assay the amount in controversy from the defendant's viewpoint rather than from the coign of vantage of each separate plaintiff.[6] As a fallback position, the defendant also argues that, even if the amount in controversy must be gauged from the claimants' outlook, this is exactly the type of "common fund" case where aggregation of the sums claimed by individual plaintiffs is appropriate in order to scale the jurisdictional heights. The court must carefully consider each of these contentions.

A. VIEWPOINTS ON VIEWPOINTS. In cases brought to secure the balm of money damages, the redress sought by the plaintiff will be precisely the same as the liability to which the defendant is exposed. If the plaintiff has a realistic expectation of recovering $50,000, then the defendant is exposed in a like amount—and, since the two outlooks coincide, it makes no jurisdictional difference whose frame of reference is used to assess the dollars in controversy. Despite this general congruence of viewpoints, courts have typically looked at things from the plaintiff's standpoint, eyeing the benefit expected to accrue to the plaintiff as the best yardstick for measurement of the amount in controversy. *E.g., Milwaukee v. Saxbe,* 546 F.2d 693, 702 (7th Cir.1976); *Kheel v. Port of New York Authority,* 457 F.2d 46, 48–49 (2d Cir.), cert. denied, 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972).[7]

A different approach must be taken when plaintiffs, as in this case, seek primarily equitable relief as opposed to money damages. Since suit is not brought to recover dollars as such, some method must be employed to translate the goal of the litigation into an approximate monetary value. That need is certainly apparent in a case ·such as this, where the plaintiffs'

---

5. The pertinent language of 28 U.S.C. § 1332(a) reads as follows:

   (a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $10,-000, exclusive of interest and costs, and is between—

   (1) citizens of different States; ....

6. To the extent this is so, the requisite amount in controversy would be present. The record reflects that in the first quarter of 1986 alone, GDC disallowed well over $3,000 in reimbursement requests related to optometric vision care. The parties agree that virtually all of these requests originated with employees who had used the services of Rhode Island-based optometrists. Thus, the defendant, on an annualized basis, would likely be exposed to well over $10,000 of such claims.

7. One rationale for hewing to such a line is the long-standing rule of law that the burden of proving federal court jurisdiction is on the plaintiff, who must accomplish that task on the face of the complaint. *See Gibbs v. Buck,* 307 U.S. 66, 72, 59 S.Ct. 725, 729, 83 L.Ed. 1111 (1939); *Lyons v. Salve Regina College,* 422 F.Supp. 1354, 1356–57 (D.R.I.1976), *rev'd on other grounds,* 565 F.2d 200 (1st Cir.1977), *cert. denied,* 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978). That rationale becomes somewhat scumbled in a case of this sort, however, as there is a parallel rule: in a removal proceeding the burden is on the petitioning defendant to establish jurisdiction. *See McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Adorno Enterprises, Inc. v. Federated Department Stores, Inc.,* 629 F.Supp. 1565, 1573 (D.R.I.1986). The paradox is apparent.

chief objective is to obtain injunctive relief. In such situations, the "amount in controversy" has historically been calculated by assessing the value to the plaintiffs of conducting their affairs free from the restriction or imposition which they seek to restrain. *See Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 347, 97 S.Ct. 2434, 2443, 53 L.Ed.2d 383 (1977); *Glenwood Light & Water Co. v. Mutual Light, Heat & Power Co.,* 239 U.S. 121, 125, 36 S.Ct. 30, 31, 60 L.Ed. 174 (1915). In the case at bar, for example, the plaintiffs hope to enjoin GDC from persisting in its refusal to recognize optometric expenses for eye care examinations in the same fashion and to the same extent as the employer recognizes ophthalmologic expenses. The "value" of such recognition to the plaintiffs is in no single case as much as $10,000—but the "value" to all of the plaintiffs, collectively, is in excess of that amount. *See ante* n. 6.

Over time, a growing number of courts have been willing to discard a strict "plaintiff's viewpoint" rule where common sense or strong practical considerations dictate utilization of a different modality. Thus, in certain instances involving declaratory or injunctive relief, courts have occasionally found diversity jurisdiction if, from the viewpoint of *either* plaintiff or defendant, more than the statutory amount could fairly be said to be in controversy. *E.g., Ronzio v. Denver & Rio Grande Western Railroad Company,* 116 F.2d 604, 606 (10th Cir.1940) (declaration of rights); *Oklahoma Retail Grocers Association v. Wal-Mart Stores, Inc.,* 605 F.2d 1155, 1160 (10th Cir.1979) (injunction). *See generally Hatridge v. Aetna Casualty & Surety Co.,* 415 F.2d 809, 814–15 (8th Cir.1969) (removal jurisdiction). GDC seizes on this authority as a cite for sore eyes, urging that it is therefore permissible for this court to measure the amount in controversy from the corporate perspective of General Dynamics. The defendant fails, however, to incorporate a key fact into its presentation: this suit has been instituted and prosecuted as a class action. In the end, that insight ties the court's hands and effectively negates the possibility of calculating the amount in controversy based on the vista from the defendant's viewpoint.

The court acknowledges that the plaintiffs' complaint at this point merely describes two anticipated classes. Neither has been certified as yet. It is clear, nevertheless, at least where the class hypothesis is not an outlandish one, that the nature of the action as framed in the complaint must govern for the purpose of the motion to remand. As Professor Moore notes: "In the interim between the commencement of the suit as a class action and the court's determination as to whether it may be so maintained it should be treated as a class suit." 3B J. Moore, *Moore's Federal Practice,* ¶ 23.50 (2d ed. 1985). *Accord City of Inglewood v. City of Los Angeles,* 451 F.2d 948, 951 (9th Cir.1971); *National Organization for Women v. Mutual of Omaha Insurance Co.,* 612 F.Supp. 100, 102 (D.D. C.1985).

■ Because this is a class action, two cases previously decided by the United States Supreme Court establish the ground rules for further inquiry. In *Snyder v. Harris,* 394 U.S. 332, 336, 89 S.Ct. 1053, 1056, 22 L.Ed.2d 319 (1969), the Court held that separate and distinct claims in class actions cannot be aggregated for the purpose of meeting the jurisdictional "amount in controversy" requirement. Later, in *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973), the Court elaborated on the conceptual underpinnings first glimpsed in *Snyder.* In *Zahn,* each of the named plaintiffs (the putative class representatives) asserted individual claims for damages in excess of $10,000. *Id.* at 292, 94 S.Ct. at 507. The Court held that this was insufficient to engage the gears of 28 U.S.C. § 1332; rather, each member of the entire class must be able to overcome the amount in controversy threshold. *Id.* at 301, 94 S.Ct. at 512. Read in the albedo of *Snyder,* *Zahn* portends that, in a class action, diversity jurisdiction is defeated so long as there is any member of the class whose separate and distinct claim does not satisfy the jurisdictional requisite. Ground down to its sheerest transparency, GDC's plea is a for-

edoomed, indeed perverse, attempt to avoid the implications of these two cases.

█ There is no doubt that, in certain circumstances, it makes considerable sense to examine the amount in controversy from the defendant's viewpoint. Perhaps the time may be ripe for a broader utilization of such an analytic tool in certain (appropriate) cases.[8] In the class action setting, however, the prescription is ineffective; respect for precedent leaves no room for improvisation. Where plaintiffs bring a class action, and the claims of the class members can most realistically be viewed as separate and distinct, it would run contrary to established authority to swerve around the forbidden aggregation of plaintiffs' claims by employing a defendant's viewpoint analysis. This court so holds, and thereby aligns itself with a number of sister tribunals which have flatly refused to allow the outlook from the defendant's perch to intrude in circumstances such as these. *See Snow v. Ford Motor Co.*, 561 F.2d 787, 790 (9th Cir.1977); *Lonnquist v. J.C. Penney Co.*, 421 F.2d 597, 599 (10th Cir.1970); *National Organization for Women v. Mutual of Omaha Insurance Co.*, 612 F.Supp. at 107–08; *Brechbill v. Diners Club, Inc.*, 80 F.R.D. 486, 488 (W.D.Pa.1978); *Barton Chemical Corp. v. Avis Rent A Car System, Inc.*, 402 F.Supp. 1195, 1197–98 (N.D.Ill.1975). Any other result would work an usurpation of the established line of precedent derived from *Zahn* and *Snyder*.

### B. AGGREGATION AGGRAVATION.

In a last-ditch effort to establish the existence of diversity jurisdiction, the defendant argues that, even if the amount in controversy is visualized from the viewpoint of the plaintiffs, it nevertheless suffices on these facts. GDC serves up a cleverly constructed theorem in support of that menu. It contends that the "associational standing" of the plaintiff Rhode Island Optometric Association (RIOA) creates a special situation permitting aggregation of claims where members seek to enforce a "single title or right." *Local Division No. 714, AFL–CIO v. Greater Portland Transit District*, 589 F.2d 1, 9 (1st Cir.1978). And, as a branch of this self-same argument, the defendant contends that aggregation is both allowable and particularly appropriate in this case because these plaintiffs, as a group and presumably as class representatives, seek to lay claim to a "common fund." *See Berman v. Narragansett Racing Association*, 414 F.2d 311, 314–15 (1st Cir.), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1969). Clever though it may be, the construct does not withstand close perscrutation.

To argue that "associational standing" is the crux of this matter—that is, that RIOA's joinder as a party plaintiff suffices in and of itself to save the day—is to exalt a mirage. Admittedly, there are circumstances where a trade organization or other special interest group may have standing solely as the representative of its members, even in the absence of injury to itself. *E.g., Hunt v. Washington State Apple Advertising Commission*, 432 U.S. at 343, 97 S.Ct. at 2441; *Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corporation*, 799 F.2d 6, 10–11 (1st Cir.1986). Yet an abstract concept of "standing" confers neither jurisdiction nor a right to aggregate members' claims to reach a jurisdictional threshold; if the law were otherwise, then *Synder* and *Zahn* could facilely be undercut by the cosmetic

---

**8.** It must be remembered, too, that the case cannot be inspected artificially from the perspective of removal alone. If a "defendant's viewpoint" assessment is a salable commodity for purposes of removal jurisdiction, it means that such an assessment should also control for purposes of original jurisdiction under 28 U.S.C. § 1332. So, to uphold the position would allow a plaintiff who concededly has no claim for the requisite minimum damages to dress his complaint in the garb of injunctive relief, assign to that craftily tailored wardrobe a value measured in terms of the defendant's compliance with the hypothetical restraining order, and litigate in the federal courts notwithstanding the puniness of his claim. Such a scenario sets caution lights to flashing. If *Zahn* and *Snyder* signify anything at all, they stand for the proposition that federal courts should be strict in interpreting the boundaries of their diversity jurisdiction. *See also Indianapolis v. Chase National Bank*, 314 U.S. 63, 76–77, 62 S.Ct. 15, 20, 86 L.Ed. 47 (1941); *Adorno Enterprises, Inc.*, 629 F.Supp. at 1568.

expedient of forming a so-called "association" to embrace the (individually insufficient) claims of putative class members and agglomerating those claims to exceed the limit required for the amount in controversy.[9] Such a handy detour simply does not exist. The Supreme Court has insisted on distinguishing associational suits from class actions, see *International Union, United Automobile, etc. Workers v. Brock,* —— U.S. ——, 106 S.Ct. 2523, 2532–33, 91 L.Ed.2d 228 (1986), and the case at bar plainly falls into the latter classification. So, GDC must look beyond the mere presence of RIOA in attempting to force its way into a federal forum. GDC has made the effort.

What the defendant sees as the distinctive feature of RIOA's involvement is the contention that the trade group and the remaining plaintiffs do not assert disparate claims, but rather sue to enforce a single, uniform right to the behoof of all optometrists and employee-consumers. GDC's approach prescinds from *Zahn,* where the Court observed:

> When two or more plaintiffs, having separate and distinct demands, unite for convenience and economy in a single suit, it is essential that the demand of each be of the requisite jurisdictional amount; *but when several plaintiffs unite to enforce a single title or right, in which they have a common and undivided interest, it is enough if their interests collectively equal the jurisdictional amount.*

*Zahn,* 414 U.S. at 294, 94 S.Ct. at 508 (emphasis supplied). *See also Pinel v. Pinel,* 240 U.S. 594, 596, 36 S.Ct. 416, 416, 60 L.Ed. 817 (1916).

■ The case at bar is, however, a square peg which cannot easily be squeezed into the rolling contours of the *Zahn* exception.[10] The difficulty rests with the fact that the "integrated right" exception permits aggregation only when (i) some discrete fund or kitty is involved, and (ii) as among the petitioning plaintiffs, the claim is both "common" (all sue by virtue of a like right) and "undivided" (the suitors make no specific claims for individual allocation of the fund). *See generally Berman v. Narragansett Racing Association,* 414 F.2d at 314–16 & nn. 10–12; *Bass v. Rockefeller,* 331 F.Supp. 945, 951 (S.D.N.Y.), *vacated as moot,* 464 F.2d 1300 (2d Cir.1971).

■ In the present matter, this model plainly fails to fit. There is no "fund" as such—no finite amount of dollars which awaits distribution. There is, to the contrary, a variable liability depending on how many of GDC's employees (and their dependents) avail themselves of vision care and what the prevailing charges for eye examinations may be from time to time. The plaintiffs do not purport to sue by virtue of an integrated right: each optometrist and each consumer-employee has his or her own lenses to grind, arising out of his or her particular circumstances. And, most telling of all—each of the plaintiffs (named and unnamed) seeks specific, individualized relief. The *Zahn* exception avails the defendant naught.

The court concludes that, notwithstanding the presence of RIOA as a party plaintiff, GDC has not shown that RIOA's members (or the plaintiffs, for that matter) seek to enforce a single title or right, or to lay claim to a definable common fund. Aggregation of amounts in controversy is, therefore, neither allowable nor appropriate.

## V. AN END TO THE SPECTACLE

In fine, this court concludes that the petitioning defendant has wholly failed to show that either federal question or diver-

---

**9.** The Court, in its formulation in *Hunt,* implicitly recognized this point by requiring that, for an association to have standing to sue on behalf of its members, one imperative is that the members must otherwise have standing to sue in their own right. *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441. Inasmuch as no member of RIOA has a claim for as much as $10,000, it would seem that *Hunt* is of scant solace to this defendant.

**10.** As Judge Flannery so accurately noted, "many of the cases that [have] permit[ted] aggregation were federal question cases in which the court may have been stretching to find a way to provide a federal forum to vindicate federal rights." *National Organization for Women,* 612 F.Supp. at 107. Thus, much of the precedent on this point is suspect.

sity jurisdiction prospers on this rocky coast. The plaintiffs have carefully selected a state law cause of action as the vehicle for their jeremiad, and their well pleaded complaint is reflective of this bias. As framed and filed, the case does not fall within the reach of 28 U.S.C. § 1331. Likewise, the claims of the various plaintiffs, regarded separately as precedent dictates, are too paltry to rise above the jurisdictional floor upon which 28 U.S.C. § 1332(a) is built. And, no acceptable way can be visualized of ballooning the amount in controversy either by peering at the case through the defendant's peephole or by treating the dispute as one involving a single integrated right asserted jointly by a host of similarly-situated sightseers.

It follows that the case was improvidently removed from the state superior court and must be remanded. The clerk of this court shall forthwith see to the transmittal of a certified copy of this memorandum and order to the clerk of the state court, and shall otherwise take such action as may be necessary or desirable in order expeditiously to implement remand as envisioned hereby. The state superior court may proceed to hear and determine the suit. The removal bond previously posted by GDC is discharged. No costs to any party.

*It is so ordered.*