**Byron MENIDES, Plaintiff,**

v.

**THE COLONIAL GROUP, INC., John A. McNeice, Jr., and C. Herbert Emilson, Defendants.**

Civ. A. No. 87–0098–MA.

United States District Court, D. Massachusetts.

Oct. 26, 1987.

Richard Dahlen, Richard E. Sanderson, Hale, Sanderson, Byrnes & Morton, Boston, Mass., for plaintiff.

William A. McCormack, Richard Mentzinger, Jr., James P. Delphey, Bingham, Dana & Gould, Boston, Mass., for all defendants.

MEMORANDUM AND ORDER

MAZZONE, District Judge.

At issue in this securities fraud case is whether § 10(b) of the Securities Act of 1934, 15 U.S.C. § 78j(b) ("Securities Act"), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission,

apply in a situation where an employee is forced to abandon his position by principals of the company for which he works, allegedly in breach of fiduciary duties on the part of the principals, and must then sell back his shares in the company pursuant to a mandatory stock repurchase agreement. Under the facts of this case, I hold that the federal securities law does not reach this far, and thus dismiss that claim pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. I also dismiss the state law claims for breach of fiduciary duty appended to the securities claim through the doctrine of pendent jurisdiction. Noting that in a 12(b)(1) motion, all uncontroverted factual allegations in the complaint are taken as true, *see, e.g., Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Needham v. Bohlen,* 386 F.Supp. 741, 744 (D.Mass. 1974), I review the facts as follows.

In 1980, the plaintiff, Byron Menides, was employed by State Mutual Life Assurance Company ("State Mutual") as a consultant to Colonial Management Associates, Inc. ("Colonial Management") an investment advisory company owned by State Mutual. Menides' expertise was in the mutual fund area in which Colonial Management was involved. Later, Menides was hired directly by Colonial Management.

On November 19, 1982, several executives of Colonial Management banded together and purchased Colonial Management from State Mutual, forming a new corporation, New Colonial, Inc. ("New Colonial") to carry on the mutual fund business. Principal among those involved were defendants John A. McNeice and C. Herbert Emilson. Menides was also included in the group of purchasers. Each of these individuals purchased shares of stock in the new company—McNeice bought 65,625 of the roughly 400,000 authorized shares; Emilson purchased 37,187, and Menides acquired 35,000 shares. Others also obtained shares; significant among these others for the purposes of this motion were Richard F. Palmer, general counsel of New Colonial, who purchased 17,500; First Boston Corporation ("First Boston"), an invest-

ment firm, which obtained 43,750; and State Mutual, which retained a convertible debenture representing 120,000 shares.

Among the documents by which New Colonial was formed was a "Stock Purchase Agreement" whereby New Colonial would repurchase the shares of any shareholder who, for any reason, left the employment of the company. The agreement established a formulaic book value for the shares at which the company would repurchase them from its employees. According to defendants' submissions, all but State Mutual and First Boston subscribed to the agreement. Initially, shares in New Colonial were not publicly traded.

New Colonial prospered, with Menides, a senior vice president in the new company, playing a major role in developing and managing what came to be New Colonial's best selling mutual fund. Eventually, $4 billion was attracted into this fund.

In June of 1984, McNeice and Emilson began negotiating to buy out the interests of State Mutual and First Boston in an effort, alleges Menides, to gain control of the corporation for themselves. This effort was apparently furthered when Richard F. Palmer, general counsel of and shareholder in New Colonial, died, and his shares were repurchased by New Colonial under the repurchase agreement. According to Menides' allegations, a successful completion of the transactions with First Boston and State Mutual would put the defendants in a dominant position in the company; if they could purchase Menides' shares as well, they would have something close to a majority of the outstanding stock in New Colonial.

At this point, the facts become less clear. According to plaintiff's pleadings, Menides spoke with Frederick Fedeli, a personal friend, the president of State Mutual, and State Mutual's representative on New Colonial's board, in June of 1984. In the course of three phone conversations between Menides and Fedeli, Menides discovered that McNeice and Emilson wanted New Colonial to buy out the interests of State Mutual and First Boston at a price above that

established in the stock repurchase agreement.[1] Fedeli added that McNeice and Emilson were also interested in obtaining Menides' shares at a price above the book value price.

Later that month, on June 27, 1984, Menides bumped into Fedeli and State Mutual's attorney John Kelly, who were in Boston to discuss the proposed buy-out of State Mutual's interest in Colonial with McNeice and others. Fedeli indicated that McNeice and Emilson were still negotiating to obtain the shares controlled by State Mutual and First Boston, but that they were no longer interested in paying a premium for Menides' shares. Menides, evidently unfazed by this revelation, nevertheless expressed concern that the costly buy-out would dilute the value of the remaining stock. He suggested to Fedeli that he was "thinking about consulting" an attorney, John Hall, a senior partner in the law firm of Choate, Hall and Stewart, about the matter. Although he did not use the terms "lawsuit" or "litigation", Menides, who would soon be departing for a vacation abroad, "may well have added that I may have wanted a lawyer to put the transaction on hold until I returned on July 17 from a planned European vacation and could discuss the dilution issue." *Affidavit of Byron Menides*, par. 8; *see also Plaintiff's Answers to Interrogatories*, response 12(3) (noting that at the meeting, Menides "raised the possibility of retaining ... Hall ... to represent my interests and *block* any such transaction until I returned from vacation") (emphasis added). Nevertheless, after the meeting with Fedeli, Menides decided to forego consulting an attorney, opting instead to rely on Palmer, New Colonial's general counsel, and the fact that a shareholder meeting would be needed to complete the transaction as sufficient guarantees that no improper action would go unchecked. Later on the 27th, however, Fedeli, meeting with McNeice about the buy-out, told him that Menides might be opposed to the buy-out, and was considering consulting an attorney. Upon hearing this, McNeice adjourned the meeting.

On July 11, 1984, Richard Palmer died. New Colonial repurchased his shares pursuant to the stock repurchase agreement.

On July 19, 1984, two days after returning from his vacation, Menides was called into McNeice's office. McNeice charged Menides with disloyalty, stemming from Menides' reported intention to see attorney Hall with regard to the State Mutual buy-out. McNeice then either suggested or insisted that Menides resign, indicating that Gordon Greer, Colonial's outside counsel and a prominent Boston attorney, agreed that he should do so. Menides refused, denied that he had acted disloyally, and explained the reasons for his reservations about the buy-out. McNeice held firm, however, and refused to allow Menides time to consider his situation. Menides, convinced that Greer's apparent support of McNeice's actions indicated that there was a legal basis for McNeice's asking for his resignation, and also "convinced that by [McNeice's] words and his manner of speaking that if I did not resign I would be fired, and I did not want that stigma," *Affidavit of Byron Menides*, par. 15, eventually agreed to tender his resignation.

The repurchase of Menides' share in New Colonial was effected through use of the mails.

On November 5, 1985, the defendants announced a public offering of New Colonial shares. Because of the high price that shares in New Colonial commanded through this public offering, plaintiff contends that had he not been fraudulently induced to part with his shares in 1984, he would have owned shares worth well above what he was paid for them at that time.

It is upon this factual scenario that Menides bases his two claims. One is a claim for violation of section 10(b) of the Securities Act of 1934 and Rule 10b–5. Jurisdiction is premised on 28 U.S.C. § 1331. The second is for breach of fiduciary duty, promised on state law and brought to this

---

1. Defendants contend that the stock repurchase agreement did not apply to First Boston or to

New Colonial. *Defendants' Answer,* par. 10.

Court under the doctrine of pendent jurisdiction.

A plethora of pleadings has been filed in this case. Currently before the Court are cross motions for summary judgment. Plaintiff has moved for summary judgment on the issue of liability, citing state law to support his claims for breach of fiduciary duty. Defendants have moved for summary judgment on the federal securities law issue, asserting that plaintiff's claims do not state a 10b–5 violation, also contending that the claim, if any, is barred by the statute of limitations. While these motions are based on somewhat different grounds, I hold that plaintiff's complaint has failed to assert facts that bring the matter within the jurisdiction of this court under the federal securities laws, and thus dismiss the case under Fed.R.Civ.P. 12(b)(1). I also dismiss the pendent state claims.

Pared down to its fundamentals, this case involves a simple employment dispute in the context of a privately held corporation. Defendants assert that Menides' suggestion that he would involve an attorney was really a threat to block New Colonial's buy-out plan and was thus disloyal. Defendants further allege that Menides goal was to try and obtain a premium buy-out price for himself, thus justifying McNeice's demand that Menides resign. Menides, on the other hand, claims that the defendants, in their lust to acquire majority control of New Colonial, used Menides' mere suggestion of seeking legal advice as a pretext to fire him, triggering the mandatory provisions of the repurchase agreement, thus divesting him of his ownership interest in the company and eliminating him as a stumbling block to their plans. Although this case may thus involve interesting questions of fact and law, and may implicate the nature and scope of the fiduciary duties owed by McNeice and Emilson to Menides, it does not properly implicate the federal securities laws.

Section 10(b) of the Securities Act declares, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails ...

. . . . .

(b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, issued by the Securities and Exchange Commission pursuant to § 10(b), provides, in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails ...

. . . . .

(2) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading ...

. . . . .

in connection with the purchase or sale of any security.

■ To state a 10b–5 cause of action, a securities fraud plaintiff must allege that, in connection with the purchase or sale of securities, a material omission or misrepresentation was made by a party with scienter, upon which the plaintiff relied despite his taking due care. *See, e.g., Holmes v. Bateson,* 583 F.2d 542, 551 (1st Cir.1978). Menides alleges that two statements made by McNeice constitute such material misrepresentations—that plaintiff was considered disloyal, and that McNeice conveyed the impression[2] to Menides that he

---

**2.** Defendants argue that "[t]he alleged 'impression' conveyed by McNeice that he would fire Menides, is not actionable for the further reason that it is too indefinite and subjective to support a cause of action." *Memorandum of Law in Support of Defendants' Motion for Summary* *Judgment,* at 21. This ignores the statements that McNeice did make, but even if defendants' argument is a valid one, I pass by it here as it is not of major significance and serves only to cloud the analysis of the securities fraud issue.

had the authority and the inclination to fire Menides if he refused to resign, a position with which Greer evidently concurred. As the plaintiff explained, the latter of these statements was by "[f]ar the most significant falsehood" because

> [t]his statement falsely left Mr. Menides with no hope of staying at Colonial—and therefore no hope of not complying with the Stock Purchase Agreement and selling his shares back to Colonial at book value.

The defendants suggest that the resale of Mr. Menides' 35,000 shares was "simply a legally required consequence of his resignation." Not so. The resale was the consequence of Mr. Menides' acceding to what Mr. McNeice, citing Mr. Greer, had incorrectly and improperly led him to believe was inevitable.

*Memorandum in Opposition to Defendants' Motion for Summary Judgment,* at 4–5 (citation omitted).

 For a misrepresentation to be actionable under Rule 10b–5, a securities fraud plaintiff must show that the statement *caused* his injury, thereby giving rise to a cause of action to redress it. To demonstrate such causation, it must be shown that the misrepresentation was of a material fact, and that the plaintiff relied upon it. *See St. Louis Union Trust Company v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 562 F.2d 1040, 1048 (8th Cir. 1977), *cert. denied,* 435 U.S. 925, 98 S.Ct. 1490, 55 L.Ed.2d 519 (1978) ("Causation has been most often analyzed in terms of the Rule 10b–5 elements of materiality and reliance"); 5 A. Jacobs *The Impact of Rule 10b–5,* § 64.02 (1980). For a statement to be material under Rule 10b–5, there must be a "substantial likelihood that, under all the circumstances, [the statement] would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). "Under this test, a fact can be material if a reasonable man

would consider it important, even if he would not view it as decisive." 5 *Jacobs* at § 61.02[b][ii].

In this case, plaintiff has failed to satisfy the reliance prong of 10b–5 causation analysis. In order to make out his case under Rule 10b–5, Menides argues that he relied on McNeice's intimation that he possessed the authority and right to fire him, along with McNeice's statement that Greer approved of that action, in tendering his resignation. This, in turn, implicates the security laws, argues Menides, because it resulted in the triggering of the automatic stock repurchase agreement and the eventual sale of his stock back to the company.[3] Of obvious importance in making this showing is the need to establish that the plaintiff did, indeed, *rely* on McNeice's statement. Although plaintiff appears to make this allegation in his affidavit, later submissions reinterpret the course of events surrounding Menides' separation from New Colonial; he now maintains that he did not *really* resign, but was fired:

> There is no question that he [Menides] was fired—that he *did not voluntarily resign* from Colonial. He was ... told to resign, told that Colonial's outside counsel agreed that he should resign, and told that he could not have even a day to think about the matter ... After he left, he received his full share of a company key-employee investment program, something not given to executives who left voluntarily. Colonial's inside counsel later described his departure as a 'termination'. Mr. Emilson has admitted under oath that Mr. Menides was fired—that the decision to fire him was made by himself, Mr. McNeice, and an outside director.

*Memorandum in Support of Motion for Partial Summary Judgment,* at 2–3 (emphasis added) (citations omitted).

Plaintiff thus appears to want to argue, simultaneously, that he was fired (evidently to assert that the defendants thus violat-

---

3. Although plaintiff also argues that McNeice's statement that Menides was disloyal was also a material misrepresentation, I treat it as providing the reason for McNeice's indication that he was inclined to fire Menides. I do not consider it as a material misrepresentation in and of itself.

ed their fiduciary duties in contravention of state law) and that he resigned (to demonstrate his reliance on McNeice's statements). Nevertheless, as he forcefully argued in the passage quoted above "[t]here is no question that he [Menides] was fired," *Memorandum in Support of Motion for Partial Summary Judgment*, at 2; it is thus hard to see upon *what* plaintiff relied. Further, plaintiff attempts to argue that merely because he may have a legal basis under state law to remedy what may be a wrongful termination, McNeice's apparent threat to fire him was somehow less real, and only a device with which McNeice could deceive Menides into resigning, accepting *arguendo* that latter interpretation of what Menides did. This ignores the fact that McNeice may have believed at the time, and may actually be able to establish, that he had a legally cognizable reason for firing the plaintiff. *See Defendants' Memorandum in Opposition to Plaintiff's Cross Motion for Partial Summary Judgment on the Issue of Liability*, at 5; *Defendants' Response to Plaintiff's Interrogatories*, response 3. Secondly, it also ignores the fact that McNeice may have gone ahead with firing Menides even in violation of state law, assuming that McNeice was willing to pay damages rather than maintain the plaintiff on the staff of New Colonial. In short, it does not appear that McNeice misrepresented the fact that if Menides refused to "resign," he would not have remained with the company. However plaintiff cares to frame it, it appears from the evidence that had Menides not resigned, he would have been fired. In either case—a forced resignation or an outright involuntary termination—the result would be the same. Plaintiff would have been forced to resell his shares back to the corporation.

The cases relied upon by Menides are distinguishable on this point as well. In *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429 (7th Cir.1987), the Court of Appeals reversed summary judgment for defendant and remanded for trial a case in which an employee shareholder in a close corporation sued the defendant corporation under the federal securities laws, alleging that prior to the effective date of his resignation, which was also the date upon which his stocks in the company would be valued under a stock repurchase agreement, he was not informed of potentially material information (a pending merger) that would affect the future value of his stock. In *Jordan*, unlike the situation here, the employee had some flexibility with respect to his departure date from the defendant corporation. As the court noted, the fact that plaintiff Jordan "exercised choice about the date on which the formula would be triggered" was significant in distinguishing the case from others. 815 F.2d at 437. "There must be an 'investment' decision, to be sure ... but Jordan unavoidably made one. That he took the value of stock into account is evident from the timing of his departure." *Id.* Menides, by his own contention that he was fired, did not have such choice concerning his departure, and hence concerning the date upon which his stocks were to be valued. Unlike Jordan, who may have relied on his employer's failure to reveal potentially material information, Menides could not have *relied* on McNeice's statements.

Plaintiff also cites *McGrath v. Zenith Radio Corp.*, 651 F.2d 458 (7th Cir.1981), *cert. denied*, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981). In that case, an employee of a company being acquired by Zenith alleged that he was induced to waive an option to buy shares in the acquired company in exchange for a promise by Zenith that he would be given a position in the acquired company after the take over. When he was fired after the acquisition, he sued Zenith, arguing that Zenith had made misrepresentations actionable under the securities laws. The Court of Appeals held that jury questions were presented as to whether the promises were made in connection with the sale of the option and whether the statements were material. Thus, in *McGrath* as in *Jordan*, the plaintiff relied on alleged misrepresentations in exchange for a sale of his option to buy stock. No such reliance exists in the instant case.

Plaintiff's case also fails because he inappropriately attempts to equate his termi-

nation with a sale of stock. Even assuming misrepresentation of a material fact, the court must ask "material to *what*"? In this case it appears that the misrepresentation was material to Menides' *termination,* not to the *sale* of his stock. To be sure, the practical result of his being fired was that he would have to sell his stock back to New Colonial, but that transaction is nevertheless independent from the circumstances surrounding his termination. The sale was the automatic result of the stock repurchase agreement. This distinction was drawn by the court in *Blackett v. Clinton E. Frank, Inc.,* 379 F.Supp. 941 (N.D.Ill.1974), a case that is substantially similar to the instant one. There, plaintiff, a director and chairman of the board of the defendant, Clinton E. Frank, Inc. ("CEF"), was allegedly illegally removed from office by Clinton E. Frank, chairman of the executive committee, chief executive officer and director of CEF. This triggered a mandatory stock repurchase agreement. Plaintiff complied with the agreement, but after, *inter alia,* a public offering of CEF stock, plaintiff filed a 10b–5 suit against Frank and CEF, alleging that their failure to disclose to plaintiff that, *inter alia,* there was to be a public offering constituted a material omission.[4] The district court dismissed the complaint on the grounds that it did not "present this court with a controversy over which it has jurisdiction." *Id.* at 948. The court in *Blackett* asserted that "the sale of stock by the plaintiff was in no way induced or caused by any alleged misrepresentations on the part of the defendants ... The sale provision of the Stock Purchase Agreement was triggered not by the plaintiff voluntarily being induced into selling his stock but by the fact that the plaintiff was terminated." *Id.* at 947. The court added

> whatever the plaintiff knew or did not know regarding CEF's plans to go public ... was irrelevant. Clearly the plaintiff has not properly alleged, nor do the relevant pleadings support a conclusion, that the plaintiff was fraudulently induced

into selling his shares of CEF by the material misrepresentation made by the defendants. In fact, the plaintiff apparently had no choice in the matter; he was obliged to sell his stock pursuant to the provision of the 1969 Stock Purchase Agreement as soon as his employer CEF terminated his services.

*Id. See also Ketchum v. Green,* 415 F.Supp. 1367 (W.D.Pa.1976), *aff'd,* 557 F.2d 1022 (3d Cir.1977); *cert. denied,* 434 U.S. 940, 98 S.Ct. 431, 54 L.Ed.2d 300 (1978).

Nor would asserting jurisdiction in this case further the policies motivating the securities laws. "The purpose of § 10(b) and Rule 10b–5 is to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be." *Chemical Bank et al. v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2nd Cir.1984), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). Rule 10b–5 was thus designed to protect unwary investors from sharp practices that rely upon deceit and deception. "The keystone of the entire legislative scheme of the securities laws is disclosure ... The fundamental purpose of federal security legislation was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry." *Blackett,* 379 F.Supp. at 945–46 (citation omitted). No further disclosure by McNeice would have altered the fact that Menides was required to sell back his shares in New Colonial if he was fired or if he resigned from the company.

As the Supreme Court warned in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 473–74, 97 S.Ct. 1292, 1300–1301, 51 L.Ed. 2d 480 (1977), "[t]he language of section 10(b) gives no indication that Congress meant to prohibit any conduct not involving

---

**4.** The stock repurchase plan had made provisions for the contingency of a public offering, indicating that the terms of the agreement would continue to apply "until such time as a registration statement became effective or CEF

was listed on a stock exchange." *Id.* at 944 (footnote omitted). Moreover, plaintiff Blackett knew prior to his receiving payment for his stocks that "the possibility of a public offering had been discussed in the past." *Id.* at 945.

manipulation or deception." Rule 10b–5 does not cover *all* fraud. *Marine Bank v. Weaver*, 455 U.S. 551, 560, 102 S.Ct. 1220, 1225, 71 L.Ed.2d 409 (1982). "Section 10(b) and Rule 10b–5 were not intended to bring within their ambit simple corporate mismanagement or every imaginable breach of fiduciary duty in connection with a securities transaction." *St. Louis Union Trust Company*, 562 F.2d at 1048. It may be that the plaintiff can make out a cause of action grounded in state law, but his case does not belong in a federal court. "This is an example of a trend of cases in which invocation of the federal securities laws is wholly inappropriate and wide of the Congressional mark ... The vice of the instant complaint is that the plaintiff has engrafted upon a state cause of action a misplaced federal securities law claim which, but for that inappropriate federal gloss, would have been litigated in a local state court." *Blackett*, 379 F.Supp. at 944. And as the First Circuit recently noted in a case that attempted to improperly extend the reach of federal jurisdiction, "[i]n order to gain access to a federal forum, a litigant must allege particulars which raise some substantial issue ... 'the jurisdiction of the federal district courts cannot be manipulated by the simple expedient of creative labelling.' *Ferris v. General Dynamics Corp.*, 645 F.Supp. 1354, 1358 (D.R.I. 1986)." *James B. Royal v. Leading Edge Products, Inc.*, 833 F.2d 1, 5 (1st Cir.1987).

For the foregoing reasons, the federal securities claims are dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction. The remaining claim, premised solely on state law and presented to this court under its pendent jurisdiction, is also dismissed. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (noting that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well").

SO ORDERED.