Frederick RAND, et al., Plaintiffs,

v.

M/A–COM, INC., et al., Defendants.

Civ. A. No. 86–1347–N.

United States District Court,
D. Massachusetts.

Sept. 18, 1992.

Arthur M. Gilman, Gilman, McLaughlin & Hanrahan, Boston, MA, for Richard T. DiBona.

Richard W. Renehan, Hill & Barlow, Boston, MA, for Thomas F. Burke.

Edward P. Leibensperger, Nutter, McClennen & Fish, Boston, MA, Dennis P. Orr, Shearman & Sterling, New York City, for M/A–Com, Inc.

Peter J. Schneider, Burns & Levinson, Boston, MA, for Paul F. Brauneis.

Memorandum and Order Re: Motions for Summary Judgment and to Strike.

BOWLER, United States Magistrate Judge.

Pending before this court are five motions for summary judgment (Docket Entry ## 476, 485, 487, 496 & 507) and three motions to strike the parties' respective statements filed under LR. 56.1 and to strike a supporting affidavit submitted in support of the motion for summary judgment (Docket Entry ## 511, 528 & 539). This putative class action, brought by various purchasers of stock of defendant M/A–Com, Inc. ("M/A–Com"), is referred to this court for trial pursuant to 28 U.S.C. § 636(c). (Docket Entry # 464).

On June 19, 1992, this court heard arguments on the above motions and took the motions under advisement.

## PROCEDURAL BACKGROUND

Plaintiffs Frederick Rand and E. Allan Lustig ("plaintiffs") are the certified class representatives in this class action filed on behalf of a class of persons who purchased M/A–Com stock during the period of time from November 7, 1984, through November 25, 1985 ("class period").[1] According to the Amended Complaint, M/A–Com disseminated numerous public statements that materially

---

1. The parties agree to this class period. (Docket Entry # 498, ¶ 1).

misrepresented the condition of the company and artificially inflated the price of M/A–Com stock. Plaintiffs also base their action on certain alleged omissions of material facts made during the class period. (Docket Entry # 129C).

In addition to M/A–Com, plaintiffs name the following individual defendants: (1) Richard T. DiBona ("defendant DiBona"), Chairman of the Board of Directors, President and Chief Executive Officer of M/A–Com during the class period; (2) Thomas F. Burke ("defendant Burke"), Executive Vice President, Administration and Finance, and a director of M/A–Com during the class period;[2] and (3) Paul F. Brauneis ("defendant Brauneis"), Vice President and Controller of M/A–Com during the class period (collectively: "individual defendants").[3] None of the individual defendants sold or realized personal gain on sales of M/A–Com common stock during the class period. (Docket Entry # 498, ¶¶ 4–5).

Count I of the Amended Complaint alleges that defendants by their misrepresentations and omissions violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ("the 1934 Act"), and Rule 10b–5 promulgated thereunder. (Docket Entry # 129C, ¶¶ 72–75). In Count II, plaintiffs allege that the individual defendants are "controlling persons" of M/A–Com who are liable by virtue of their corporate positions under Section 20 of the 1934 Act, 15 U.S.C. § 78t(a) ("Section 20"). (Docket Entry # 129C, ¶¶ 77–78).

## I. DEFENDANT M/A–COM, INC.'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 496)

### FACTUAL BACKGROUND

M/A–Com is a Massachusetts high technology corporation. During the class period, M/A–Com supplied and manufactured components, equipment and systems for commercial telecommunications and defense applications. (Docket Entry # 129C, ¶ 8; Docket Entry # 498, ¶ 2). M/A–Com conducted its business through the following three business segments: Component Products; Cable/Home Communications; and Integrated Digital Communications. (Docket Entry # 129C, ¶ 9; Docket Entry 498, ¶ 2).

M/A–Com's fiscal year generally runs from October 1 to September 30. In 1983, M/A–Com restructured its organization, which previously consisted of an estimated 21 operating companies, in order to form eight operating divisions for the three business segments. (Docket Entry # 541, ¶ 45). A Chief Financial Officer ("CFO") headed each division. Fiscal Year ("FY") 1985 began on September 30, 1984.

Plaintiffs' principal complaint, as outlined in their memorandum in support of their motion for summary judgment (Docket Entry # 508), is that M/A–Com's public forecasts substantially diverged from its internal reports and analyses. Plaintiffs identify five public statements issued by M/A–Com in FY 1985 as materially false or misleading and made without a reasonable basis in fact in light of the internal communications. Plaintiffs argue that these statements misled the public by overstating future earnings growth. M/A–Com also allegedly failed to correct these statements at later dates. (Docket Entry # 508).

The five public statements are as follows:

(1) On November 29, 1984, at an annual meeting of analysts in New York, Joseph Bothwell ("Bothwell"), a Vice President of M/A–Com whose responsibilities included investor relations (Docket Entry # 543, Ex. 20), stated that:

> We have an estimate range on the Street of somewhere around $1.00 to $1.50. The analyst who has $1.50 has just reduced it the other day. The consensus range seems to be between $1.15 and $1.30. So when we say 20% to 30%, just figure that it's in that consensus range of $1.15 to $1.30.

(Docket Entry # 541, ¶ 96). Although apparently no individual from M/A–Com publicly referred to an earnings growth of "28 to

---

**2.** Defendant Burke died in an automobile accident on September 21, 1989, and his estate was substituted as defendant in this action.

**3.** "Defendants" in this Memorandum and Order refers to the individual defendants and M/A–Com as a group.

38%," an earnings per share of $1.15 represents a 28% improvement on the earnings per share in FY 1984. (Docket Entry # 526, ¶ 5).

(2) At the annual shareholders' meeting held on February 28, 1985, defendant DiBona made the following statement:

> We have previously indicated that the markets which we serve will expand at a rate which will enable us to achieve earnings growth in the order of 20 to 30% [$1.08 to $1.17 per share]. We expect to be able to achieve this type of earnings growth in fiscal 1985. Now I can say quite frankly that until recently we had hoped to do better than that in fiscal '85. Namely, do better than 20–30% earnings growth in '85 relative to '84.

(Docket Entry # # 436 & 508).[4]

(3) From March 10 to 13, 1985, defendant DiBona and Bothwell attended the Alex Brown & Sons, Inc.'s Communications and Information Systems Seminar. Bothwell advised the security analysts attending the seminar that:

> Our estimates are that we will be growing at an average rate of 20% to 30% per year in the foreseeable future, and I think we're right on target. We are expecting to be in that range for 1985.

(Docket Entry # 541, ¶ 141).[5]

(4) On May 21, 1985, M/A–Com held a meeting for security analysts. Defendant DiBona reiterated a forecast of 20% to 30% growth in earnings per share [or $1.08 to $1.17] for FY 1985. (Docket Entry # 526, ¶ 11; Docket Entry # 271, Ex. B, p. 6).[6]

(5) On September 13, 1985, defendant DiBona and Bothwell represented M/A–Com at the 1985 "TSAI"[7] forum. At the forum, Bothwell reduced the company's forecast for FY 1985 to a range of $1.00 to $1.05 or a growth rate of 11% to 17%. He stated that:

> Most of the estimates that I have seen currently indicate that the consensus is that the company should do somewhere between $1.00 and $1.05 for fiscal 198[5] ended in September ... This seems to be the appropriate range. I must say most of them are closer to $1.00 for 1985 ... and certainly we wouldn't quarrel with that.

(Docket Entry # 541, ¶ 181).[8]

Although the above statements, in plaintiffs' words, constitute "the core of this case,"[9] there were a number of additional public statements and pronouncements which indicated that M/A–Com's earnings in FY 1985 were growing and would continue to grow. For example, on November 7, 1984, the beginning of the class period, M/A–Com issued a press release. Therein, defendant DiBona announced that "the company expects continued growth through 1985." (No Docket Entry Number Assigned, Volume I of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 4). Defendant DiBona averred that he made this pronouncement in good faith. (Docket Entry # 477, ¶¶ 6–8).

---

4. Plaintiffs argue that the last sentence represents an implicit acknowledgment that, prior to the shareholders' meeting, M/A–Com was forecasting more than a 30% rate of growth thereby confirming the higher figure of 28% to 38% rate of growth implicit in the November 28, 1984, statement. As evidenced by the first sentence of the statement, however, M/A–Com simultaneously represented an earnings growth rate of the lower figure, 20% to 30%.

5. Although plaintiffs claim this statement is unchallenged, they also refer this court to a transcript of the seminar contained in "Defendant Exh. 8." (Docket Entry # 541, ¶ 141). Defendants' Exhibit 8 is not a transcript of this seminar. Nor can this court, after a diligent search of the record, locate such a transcript.

6. Plaintiffs refer this court to "Exh. 62" for this statement. (Docket Entry # 541, ¶ 162). The exhibit is actually located in Docket Entry Number 271 and tabbed as Exhibit B.

7. Neither party defined the acronym "TSAI" in his papers. A review of an exhibit indicates that TSAI refers to a group of security analysts.

8. Plaintiffs refer this court to "Exh. 80" as a transcript of the TSAI forum. (Docket Entry # 541, ¶ 181). Plaintiffs fail to note what document contains exhibit 80. Nor can this court, after a search of the record, locate this transcript. The statement is, however, apparently unchallenged and defendant DiBona refers to this statement in his supplemental affidavit. (Docket Entry # 526).

9. (Docket Entry # 508).

M/A–Com's 1984 Annual Report dated December 3, 1984, contained a "Letter from the Chief Executive Officer." This letter similarly presented an optimistic view of future earnings and read, in part, as follows:

It is our firm belief that our major problems are behind us, that the resources of the Company are better focused than at any time in our recent history and that we are in a position to accelerate our earnings and sales growth.

(No Docket Entry Number Assigned, Volume I of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 9).

Plaintiffs' major focus, however, is on the five statements detailed above and, in particular, how these statements differed from internal forecasts. Plaintiffs contend that the internal forecasts provided a more accurate basis to assess M/A–Com's future performance than the annual budget for FY 1985 ("1985 Budget").

M/A–Com's internal structure and reporting system was rather complex. On a monthly basis, each operating division prepared reports ("Red Books") estimating quarterly and/or fiscal year results. Red Books included financial information for a division, including quotas, sales and profits. (No Docket Entry Number Assigned, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Ex. 13, p. 50). Senior management received these "bottoms up" reports on a regular basis. According to Frank A. Brand ("Brand"), Executive Vice President and Chief Operating Officer of M/A–Com during the class period, defendant Brauneis' department consolidated the numbers contained in the various Red Books and supplied the finished document to the OOTP.[10] (*Id.*, Ex. 11, pp. 48–49; Docket Entry # 500, ¶ 2). Defendant Brauneis also indicated that his office was responsible for compilation of the Red Books. (No Docket Entry Number Assigned, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. 1, Ex. 1, pp. 79–80). Ken Potz

("Potz"), Corporate Manager of Planning and Analysis at M/A–Com during the class period, averred that he was responsible for compiling the company's internal projections of financial growth, including the Red Books. (Docket Entry # 494, ¶¶ 1–2).

On a quarterly basis, defendant Brauneis' department submitted internal financial statements to senior management. These reports, known as Blue Books, consolidated actual operating results and compared these results to projections contained in the budget for the particular fiscal year. (Docket Entry # 541, ¶ 38; No Docket Entry Number Assigned, Volume II of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 17). Defendant Brauneis represented that his office was responsible for compiling the information that went into the Blue Books. (No Docket Entry Number Assigned, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. III, Ex. 1, pp. 89–90).

The company also prepared an internal Mid–Year Estimate. Preparation of this document began near the close of the first quarter and prior to the annual shareholders' meeting. The Mid–Year Estimate contained actual results for the first quarter and financial projections for the three remaining fiscal quarters. (Docket Entry # 494, ¶ 2). Each operating unit or division formulated a projection. These projections were consolidated for an overall estimate of M/A–Com's future financial performance. (Docket Entry # 541, ¶¶ 33–34; No Docket Entry Number Assigned, Volume II of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 18).

Each division also prepared monthly "OOTP Reports" describing, in narrative form, the state of business in a particular division. OOTP Reports included actual orders and sales for the current quarter. Members of the OOTP and senior management received these reports on a monthly basis. (Docket Entry # 541, ¶ 35; No Docket Entry Number Assigned, Affidavit of Fred

---

10. The acronym "OOTP" refers to the Office Of The President, created as part of M/A–Com's restructuring process. In FY 1985, the OOTP included defendants DiBona and Burke.

T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. III, Ex. P).[11]

Defendant DiBona averred that the Red Books, Mid–Year Estimate and OOTP Reports contained estimates and were used solely for internal purposes. (Docket Entry # 526, ¶ 3). He further averred that management did not consider these reports public information. Although defendant DiBona reviewed these reports, he did not consider them "reliable projections" of the company's actual performance. (Docket Entry # 526, ¶ 3). Similarly, Potz stated that operating divisions oftentimes provided artificially low estimates because their performance was judged against whether they met their estimates. (Docket Entry # 464, ¶ 4).

The process to compile the annual budget was also elaborate. The annual budget resulted from a series of meetings, negotiations and analyses between division personnel and senior management. (Docket Entry # 526, ¶ 3). The budget also provided a basis for bonus compensation to management. (Docket Entry # 541, ¶ 60).[12] Once compiled, the annual budget was submitted to the Board of Directors. The 1985 Budget was submitted to the board in November of 1984. (Docket Entry # 500, ¶ 4).

For FY 1983, the budget forecasted earnings per share of $1.27. Actual earnings per share were $0.76. Similarly, the 1983 Budget forecasted a profit of $88 million whereas actual profit was $50 million. (Docket Entry # 541, ¶ 61).[13]

The 1984 Budget forecasted total earnings per share of $1.00. Quarterly breakdown was as follows: first quarter, $0.11; second quarter, $0.18; third quarter, $0.32; and fourth quarter, $0.39. First quarter earnings of $0.17 met 1984 Budget goals. (Docket Entry # 541, ¶¶ 66 & 69).[14] The 1984 Mid–Year Estimate, however, downgraded probable total earnings per share to $0.84 and further estimated second, third and fourth quarter results respectively at $0.11, $0.24 and $0.32. (Docket Entry # 541, ¶ 68).[15] Actual results for the second quarter of $0.18 met the 1984 Budget projection. (Docket Entry # 541, ¶ 69).[16] Third and fourth quarter actual results of $0.25 and $0.30,[17] however, proved similar to the internal 1984 Mid–Year Estimate as opposed to the 1984 Budget figures.

The 1985 Budget contained a forecast of $1.15 total earnings per share. (Docket Entry # 541, ¶ 88; No Docket Entry Number Assigned, Volume II of Exhibits to Richard T. DiBona's Motion for Summary Judgment,

11. Plaintiffs incorrectly refer this court to "Exh. 7." (Docket Entry # 541, ¶ 35).

12. Defendants apparently claim this statement misrepresents the record. Plaintiffs refer to "DiBona Tr., September 12, 1991, Tr. 46" without noting what document contains this exhibit or noting the date of filing. Having reviewed the record and located this document, however, plaintiffs' assertions are supported in the record. (No Docket Entry Number Assigned, Volume I of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 1, p. 46).

13. Although plaintiffs represent this statement is unchallenged, plaintiffs again fail to provide this court with correct citations to the record.

14. To support these figures, plaintiffs refer, in part, to "Exh. 21," the 1984 Blue Books. Plaintiffs fail to note what document contains this exhibit. Nor do plaintiffs provide the date of filing. Having searched the record, this court cannot locate an exhibit 21.

Plaintiffs, however, represent that these statements are unchallenged. More importantly, the

1985 Mid–Year Estimate states that actual earnings per share in the first quarter of FY 1984 were $0.17. (No Docket Entry Number Assigned, Exhibits to Second Supplemental Affidavit of Fred T. Isquieth in Opposition to the Motion for Summary Judgment of Paul F. Brauneis, Vol. III, Ex. BA).

15. To support these facts, plaintiffs refer, in part, to the 1984 Mid–Year Estimate as "Exh. 20." Plaintiffs fail to note what document contains this exhibit. Nor do plaintiffs provide the date of filing. Having searched the record, this court cannot locate an exhibit 20.

The 1984 Mid–Year Estimate, however, is included as Exhibit AX to the Second Supplemental Affidavit of Fred. T. Isquieth in Opposition to the Motion for Summary Judgment of Paul F. Brauneis, filed on January 27, 1991. These statements are also apparently unchallenged.

16. According to plaintiffs, defendants do not challenge this statement.

17. These figures are taken from the 1985 Mid–Year Estimate.

filed January 27, 1992, Ex. 15). The quarterly estimates were as follows: first quarter, $0.21; second quarter, $0.24; third quarter, $0.33; and fourth quarter, $0.37. (*Id.*). It is undisputed that actual results for the first quarter ($0.21) met the budgetary target. (Docket Entry # 502, ¶ 20; No Docket Entry Number Assigned, Volume II of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 17).[18] The 1985 Mid–Year Estimate forecasted quarterly estimates as follows: second quarter, $0.11; third quarter, $0.23; and fourth quarter, $0.39. (*Id.*, Ex. 18).

Plaintiffs admit that M/A–Com's first quarter profit was only $1 million off the 1985 Budget target. The Consolidated Statement of Profit and Loss for the first quarter as well as the Summary of Sales & Profit for Fiscal Year 1985 for the first three months support the fact that actual results for the first quarter corresponded to 1985 Budget projections.[19] (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Ex. R).

## A. *The First Statement*

Turning to the specifics of the first statement, Bothwell averred that he made this statement in good faith based, in part, on the 1985 Budget. (Docket Entry # 502, ¶ 14 & Ex. A). In addition, he based his statement

on the fact that total earnings per share increased 18% from FY 1983 to FY 1984. (Docket Entry # 502, ¶ 14(i)). Finally, Bothwell based his statement on a number of communications with security analysts in October and early November of 1984. (Docket Entry # 502, ¶ 14 & Ex. B). For example, Bothwell relied on the following communication dated November 9, 1984, from Bear Stearns:

> With strong orders registered early in the fiscal quarter of fiscal 1985 and margins improving meaningfully in the systems division, we believe the June earnings breakthrough was only the beginning of a long-lived series of superior earnings comparisons. The shares, in our opinion, should continue to appreciate as earnings grow; hence, we continue to recommend purchase ... We have revised the F85 (sic) single point EPS estimate from $1.30 to $1.25, in a range of $1.20 to $1.30.

(Docket Entry # 502, Ex. B).

Despite these averments and the fact that first quarter results met the 1985 Budget projection of $0.21, plaintiffs argue that the first statement was misleading. They urge that a growth rate of $1.15 to $1.30 in earnings per share represents, mathematically, a 28% to 39% increase in growth from FY 1984. (No Docket Entry Number Assigned, Plaintiffs' Memorandum as a Reply in Support of Their Motion for Summary Judgment, p. 10).[20] In his deposition, defendant

---

18. This court does not give strong weight to plaintiffs' assertion of accounting manipulation in the first quarter (Docket Entry # 541, ¶¶ 120 & 122) given the independent audit review performed by the accounting firm of Price Waterhouse. Price Waterhouse reviewed M/A–Com's accounting practices for FY 1985 and determined that the financial position of M/A–Com was fairly presented as of September 28, 1985. (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Ex. D, p. 33). The Price Waterhouse audit did not, however, break down FY 1985 into quarters. The November 26, 1984, OOTP Report also recognized the need to adjust research and development figures. (No Docket Entry Number Assigned, Volume II of Exhibits to Richard T. DiBona's Motion for Summary Judgement, filed January 27, 1992, Ex. 14).

Nevertheless, absent further evidence, plaintiffs' assertion regarding accounting manipu-

lation in the first quarter of FY 1985 is not convincing.

19. New Orders for FY 1985 in the first three months were, however, lower when compared to 1985 Budget projections in six of M/A–Com's eight divisions. (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. II, Ex. R). M/A–Com's second quarter began on December 30, 1984, and ended on March 30, 1985. (No Docket Entry Number Assigned, Volume I of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 5 & 6).

20. This document has no docket entry number and contains a file date stamp of June 9, 1992, which is marked over in pencil with an "X."

DiBona, referring to this statement, stated that mathematically "twenty to thirty percent of over 90 cents is not 1.15 to 1.30. Twenty to thirty percent is a buck eight to a buck twenty-seven. So he was inaccurate, but that's the comments he [Bothwell] made. I didn't interrupt his meeting, his presentation." (No Docket Entry Number Assigned, Volume I of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 2, p. 45).

M/A–Com's second quarter began on December 30, 1984. For this quarter, the 1985 Budget forecasted earnings per share of $0.24. The Mid–Year Estimate, however, forecasted probable earnings per share in the second quarter of $0.11 and downgraded annual earnings per share to $0.94. (No Docket Entry Number Assigned, Volume II of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 18). The date of the Mid–Year Estimate is not entirely clear although it was prepared at or about the time of the February 28, 1985, annual shareholders meeting.[21] (Docket Entry # 526).

Actual net income for the second quarter was $9,900,000. The estimated figure in the 1985 Budget was $10,300,000. (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. II, Ex. S). Actual earnings per share in the second quarter were $0.23, one cent below the 1985 Budget figure of $0.24. (*Id.*).[22] New orders for seven divisions in the first six months of FY 1985, however, remained below 1985 Budget projections. (*Id.*). Actual results for the second quarter, of course, were only available after March 30, 1985.

During the second quarter, plaintiffs allege that M/A–Com was experiencing "critical failures" in the Components, Cable/Home and M–Tel divisions.[23] (Docket Entry # 508). The Mid–Year Estimate, when compared to the 1985 Budget, included lower figures for these divisions. (No Docket Entry Number Assigned, Volume II of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 18).

B. *The Second Statement*

The second allegedly false or misleading statement took place on February 28, 1985, at the annual shareholders' meeting. At the meeting, defendant DiBona stated his belief that M/A–Com would achieve a 20% to 30% growth rate [$1.08 to $1.17 earnings per share]. Defendant DiBona averred that he believed the objective of 20% to 30% growth in earnings per share was reasonable. (Docket Entry # 526, ¶ 6).

In regard to the basis for this statement, defendant DiBona averred that his statement was consistent with the 1985 Budget. He knew that M/A–Com 'had met the 1985 Budget's projected earnings per share for the first quarter. He noted that M/A–Com was in the process of formulating the 1985 Mid–Year Estimate at this time. He could not recall whether he reviewed the Mid–Year Estimate before the annual shareholders' meeting.[24]

The Mid–Year Estimate forecasted $0.11 probable earnings per share and $0.14 maximum earnings per share for the second quarter. Defendant DiBona, however, characterized the Mid–Year Estimate "as a conservative document [which] . . . understated the projected performance of the Company." (Docket Entry # 526, ¶ 7).

He also realized that the 1985 Budget included a number of contingencies or "cushions." These contingencies included variations in tax rates, interest on capital charged to divisions and "a $7.25 million management reserve, which amounted to $.11 earnings per

---

**21.** The Mid–Year Estimate also included actual results for the first month (January) of the second quarter.

**22.** (No Docket Entry Number Assigned, Volume I of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 6).

**23.** Plaintiffs also allege weaknesses in these divisions for the first quarter. (Docket Entry # 541, ¶ 126(f)).

**24.** (No Docket Entry Number Assigned, Volume I of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 2, pp. 57–58 & 65).

share" for FY 1985. (Docket Entry # 526, ¶ 8).

Plaintiffs argue that, in light of the internal forecasts and particularly the 1985 Mid-Year Estimate, defendant DiBona's statement lacked a reasonable basis in fact. For FY 1984, the 1984 Budget proved more accurate than the 1984 Mid-Year Estimate in forecasting actual earnings per share for the second quarter. For the third and fourth quarters, however, the Mid-Year Estimate proved more reliable than the 1984 Budget. The 1985 Mid-Year Estimate, in contrast to the 1985 Budget, forecasted a substantially lower figure for earnings per share in the second quarter. In addition, there is some indication in the record of a hiring and salary freeze instituted at M/A-Com in February of 1985. (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. III, Ex. 6).

### C. The Third Statement

Between March 10 and 13, 1985, Bothwell made the third allegedly misleading statement at the Alex Brown & Sons, Inc.'s Communications and Information Systems Seminar ("the seminar"). (Docket Entry # 502, ¶ 20). This statement was similar to the second and reiterated that M/A-Com expected to grow at a rate of 20% to 30% in the foreseeable future. Bothwell averred that, to the extent he made any statement at the seminar, he made it in good faith based, in part, on financial results obtained in 1984. He also based his statement on various unidentified documents and discussions with

senior management. (Docket Entry # 502, ¶ 20 & Ex. C).

Plaintiffs argue that internal documents contradict Bothwell's statement.[25] Plaintiffs also assert that, immediately after the February 28, 1985, annual shareholders meeting, M/A-Com senior management convened a meeting with division CFOs to discuss instituting an austerity program and to revise earnings per share forecasts for FY 1985. (Docket Entry # 508; No Docket Entry Number Assigned, Plaintiffs' Memorandum as a Reply in Support of Their Motion for Summary Judgment).[26] Defendant Brauneis recalled that, after the February 28, 1985, annual shareholders meeting, M/A-Com reexamined its plans for FY 1985, focusing on the reduction of costs. (Docket Entry # 445, Ex. AE, pp. 67–68). The 1985 Mid-Year Estimate estimated probable earnings per share for the second and third quarters at $0.11 and $0.23 while the 1985 Budget forecasted second and third quarter earnings per share of $0.24 and $0.33.

### D. The Fourth Statement

Defendant DiBona made the fourth allegedly misleading statement on May 21, 1985, at a meeting of security analysts. Prior thereto, on March 26, 1985, Potz sent a Management Estimate Report containing financial estimates for March of 1985 to M/A-Com's senior management, including defendants DiBona, Burke and Brauneis. (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. III, Ex.

**25.** Although plaintiffs' first memorandum in support refers to internal documents generated, in part, after this statement (Docket Entry # 508), plaintiffs' reply brief refers to internal documents generated prior to March 10, 1985. (No Docket Entry Number Assigned, Plaintiffs' Memorandum as a Reply in Support of Their Motion for Summary Judgment).

**26.** There is an "X" marked over the file date stamp. Footnote 15 in this reply memorandum cites to four exhibits and a number of deposition transcripts. Plaintiffs also refer to various OOTP reports and Red Books for this period as well as an October 1, 1991, deposition of defendant Di-

Bona. After a search of the record, these exhibits and transcripts cannot be located. Plaintiffs also refer to the April 14, 1989, Lucchese deposition at page 127 without noting where this document is located in the record. Although the record contains excerpts of this deposition, it does not contain page 127. (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. III, Ex. 3). A number of later exhibits referenced in plaintiffs' annotated Rule 56.1 statement (Docket Entry # 541, ¶¶ 151–153) also cannot be located.

Q).[27] Therein, Potz compared the second quarter forecast for "PBT"[28] contained in the 1985 Budget ($17,135) to that contained in the 1985 Mid–Year Estimate ($7,656). Although he described actual results for the second quarter as on budget for a number of divisions, he also described volume as flat or down in a number of divisions for the first six months of FY 1985. The Red Book "dated March 26, 1982(sic),"[29] estimated earnings per share at $0.20 for the second quarter in contrast to the 1985 Mid–Year Estimate for the second quarter of $0.11. (*Id.;* Docket Entry # 526, ¶ 10).

In April of 1985, actual results for the second quarter were available. Earnings per share, as noted *supra,* for the second quarter were $0.23 or one cent below the 1985 Budget figure of $0.24. (Docket Entry # 526, ¶¶ 7–10)

In March, April and May of 1985, M/A–Com was pursuing three "major" opportunities: MILSTAR, Videocipher and Personal Earth Stations. (Docket Entry # 526, ¶¶ 9 & 11–12). If successful, these projects would presumably increase M/A–Com's profits. Referring to "the April estimate," presumably the April Red Book, defendant DiBona noted that the earnings per share estimate contained therein was $0.21, as opposed to the 1985 Budget figure of $0.33 for the third quarter. (Docket Entry # 526, ¶ 12).

Through an inter-office communication dated May 15, 1985, Brand advised defendants DiBona, Burke, Brauneis and other senior M/A–Com officials that "we cannot live with $0.25 in Q3" and that "the original scenario" was not feasible because of problems in the Cable/Homes division. He then surmised that they would have to find an "alternative scenario" to meet "the $0.30 objective." (Docket Entry # 500, Ex. B; No Docket Entry Number Assigned, Volume II

of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 19).

As noted above, defendant DiBona made the fourth allegedly misleading statement on May 21, 1985. Therein, he reiterated the forecast of 20% to 30% growth. At that time, actual results for the first two quarters in earnings per share were $0.44, one cent below the 1985 Budget figure of $0.45. The Mid–Year Estimate contained contrary figures.

### E. *The Fifth Statement*

On September 11, 1985, defendant DiBona made the fifth and final allegedly false and misleading statement. Prior thereto, the "June estimate,"[30] issued on June 18, 1985, projected fourth quarter earnings per share of $0.31 [1985 Budget, $0.37; Mid–Year Estimate, $0.39]. (Docket Entry # 526, ¶ 14). In June of 1985, the United States Department of Defense announced the award of the MILSTAR contract to Raytheon.

On July 31, 1985, M/A–Com issued a press release. Therein, M/A–Com announced actual earnings per share of $0.26 for the third quarter. (Docket Entry # 526, ¶ 13; No Docket Entry Number Assigned, Supplemental Exhibit Appendix, Vol. XIV, Ex. 94).

The "July estimate" forecasted fourth quarter earnings per share of $0.22 [1985 Budget, $0.37; Mid–Year Estimate, $0.39]. (Docket Entry # 526, ¶ 14). The "August estimate" downgraded fourth quarter results even further to $0.18 earnings per share. (*Id.*). Accordingly, with actual results for the first three quarters resulting in $0.70 earnings per share and an August forecast of $0.18 earnings per share for the fourth quarter, M/A–Com's total annual earnings per share would be $0.88, compared to the 1985 Budget figure of $1.15. Plaintiffs therefore

---

27. Plaintiffs incorrectly identify this document as "March FY 85 Q2 Red Book, Exh. 51." (Docket Entry # 541, ¶ 144). This document is actually contained in exhibit Q of the Affidavit of Fred T. Isquicth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis.

Although not identified in exhibit Q as a "Red Book," defendant DiBona averred that the March Red Book was "dated March 26, 1982(sic)." (Docket Entry # 526, ¶ 10).

28. Presumably PBT refers to profit before taxes.

29. This court assumes a typographical error was made in the year.

30. Presumably, the "June estimate" as well as the "July estimate" and "August estimate" noted *infra* refer to the Red Books for these months.

argue that M/A–Com failed to correct previous statements projecting higher earnings per share and higher growth in FY 1985.

As noted above, on September 11, 1985, defendant DiBona made the fifth and final allegedly false and misleading statement. At the TSAI forum, he revised earnings per share for FY 1985 downward to $1.05 to $1.00. (Docket Entry # 541, ¶ 180).[31] In making this downward adjustment and despite the more negative information contained in the June, July and August Red Books, defendant DiBona relied upon various projections issued by security analysts and, in particular, the $1.00 total earnings per share estimated for FY 1985 by Harry E. Wells of Adams, Harkness & Hill, Inc. (Docket Entry # 526, ¶ 14).

Defendant DiBona further averred that he believed the estimates contained in the monthly Red Books were "below actual performance."[32] (Docket Entry # 526, ¶ 15). In making the fifth statement, he also relied on the potential sale of shares to a high technology company, Argo. (Docket Entry # 526, ¶ 16).

On November 6, 1985, M/A–Com announced actual results for FY 1985 of $0.92 total earnings per share based on net profit.[33] The price of M/A–Com stock fell from trading at 16½ on November 6, 1985, to trading at 13 on November 7, 1985. (No Docket Entry Number Assigned, Exhibit filed by M/A–Com on June 19, 1992).

## DISCUSSION

■ M/A–Com seeks summary judgment on the grounds that plaintiffs fail to show a genuine issue of material fact as to "scienter" and "materiality." M/A–Com further claims plaintiffs fail to show that the alleged statements were false or misleading and that certain statements are too vague to support a cause of action.[34] (Docket Entry # 496).

Summary judgment is permissible when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The entire record must be reviewed in the light most favorable to the party opposing summary judgment with all reasonable inferences drawn in that party's favor. *Aponte–Santiago v. Lopez–Rivera*, 957 F.2d 40, 41 (1st Cir.1992).

A "genuine" issue is one that "must be referred to a fact finder because it could reasonably be resolved in favor of either party." *Id.* at 41; *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (court must determine whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). "A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck*

---

31. After a search of the record, the transcript of the TSAI forum, identified only an "Exh. 80," could not be located.

32. It is also unclear whether defendant DiBona had the $0.23 estimate contained in the September Red Book at the time he made his September 11, 1985, announcement. Even this estimate, however, remained substantially below the 1985 Budget and Mid–Year Estimate figures of $0.37 and $0.39 for the fourth quarter.

33. There is some dispute about the actual results for FY 1985. Plaintiffs maintain M/A–Com experienced total earnings per share of $0.92 (Docket Entry # 541, ¶ 185) while defendants assert total earnings per share of $0.97 (Docket Entry # 526, ¶ 17). The $0.97 figure, according to plaintiffs, is after "extraordinary items." (Docket Entry # 508). Defendants further state that actual results for the first three quarters were $0.72 (Docket Entry # 523, ¶ 7), compared to plaintiffs' figure of $0.70.

34. M/A–Com made its arguments regarding vagueness before plaintiffs identified the five allegedly misleading statements. This court finds the five allegedly misleading statements are sufficiently definite to avoid summary judgment on the basis of vagueness. Although generalized declarations of optimism regarding future performance may not render statements misleading, given the inclusion of percentage figures of growth and references to earnings per share, this court finds the five statements neither vague or amorphous. *See Pinkowitz v. Data General Corporation*, 1991 WL 288829 (D.Mass.1991) (noting that without figures or reference to past industry practice, statements were not misleading); *In re Healthco International, Inc. Securities Litigation*, 777 F.Supp. 109, 113 (D.Mass.1991) (optimistic, vague projections of future success do not create liability absent either specific quantification or projected results implying certainty).

*v. Somerset Technologies,* 882 F.2d 993, 996 (5th Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Initially, the moving party, in this instance M/A–Com, must inform the court of the basis of its motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, "which it believes demonstrate the absence of a genuine issue of material fact." *Winter Hill Frozen Foods & Services, Inc v. Haagen–Dazs Company, Inc.,* 691 F.Supp. 539 (D.Mass.1988) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Conclusory assertions that the nonmoving party has no evidence to prove its case are insufficient. Rather, the moving party must affirmatively show the absence of evidence in the record. *Celotex Corp. v. Catrett,* 477 U.S. at 328, 106 S.Ct. at 2555 (White, J., concurring and Brennan, J., dissenting).

Once the moving party carries its burden under Rule 56(c), Fed.R.Civ.P., the nonmoving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). At that point, under Rule 56(e), Fed.R.Civ.P., the nonmoving party must go beyond the pleadings and come forward with "specific facts showing that there is a genuine issue for trial" by way of affidavits, depositions, answers to interrogatories or admissions on file. *Id.* at 587, 106 S.Ct. at 1356.

To state a claim under Section 10(b) and Rule 10b–5 promulgated thereunder, plaintiffs must establish the following: (1) defendants misrepresented or omitted material facts in connection with the purchase or sale of a security; (2) plaintiffs' relied on the material misrepresentation or omission; (3) defendants made the material misrepresentation or omission with scienter; and (4) due care by plaintiffs. *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. 1444, 1448 (D.Mass.

1989) (discussing elements of a Rule 10–b(5) claim); *Menides v. Colonial Group, Inc.* 681 F.Supp. 965, 968 (D.Mass.1987) (noting elements of claim under Rule 10b–5).

 M/A–Com seeks summary judgment on the basis of the absence of scienter and/or materiality. The absence of either element is sufficient to support a motion for summary judgment. *Bryson v. Royal Business Group,* 763 F.2d 491, 493 & n. 3 (1st Cir.1985) (absence of scienter constitutes a dispositive ground for summary judgment); *see Kirby v. Cullinet Software, Inc.,* 721 F.Supp. at 1449 (summary judgment sought on basis of lack of materiality and scienter).

 Materiality is generally defined in the context of a reasonable shareholder. As recently noted in this circuit, "information is 'material' only if its disclosure would alter the 'total mix' of facts available to the investor and 'if there is a substantial likelihood that a reasonable shareholder would consider it important' to the investment decision." *Milton v. Van Dorn Company,* 961 F.2d 965, 969 (1st Cir.1992) (quoting *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–232, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988)). The materiality of the disclosed or undisclosed information is essential to recovery under Rule 10b–5. *Id.* at 969.

 Furthermore, any material disclosure, if made, must also be either false or misleading in order to violate Rule 10b–5. *See Backman v. Polaroid,* 910 F.2d 10, 14–16 (1st Cir.1990); *Kirby v. Cullinet Software, Inc.,* 721 F.Supp. at 1450 (statements, including projections, "must be misleading as to a material matter to be actionable"). The first statement was literally true for the first quarter. Earnings per share for the first quarter ($0.21) met the 1985 Budget projection and were also on track to meet an annual total earnings per share of $1.15. Therefore, at the time Bothwell projected earnings in the range of $1.15 to $1.30 on November 29, 1984, his statement was neither false or misleading.[35]

---

**35.** The fact that the statement was somewhat confusing in light of the actual mathematical calculations does not make the statement misleading. While the words could have been clear-

er, they were not misleading. Nor does defendant DiBona's characterization of Bothwell's words as inaccurate lead to a contrary conclu-

■ A prediction, although true when made, may nevertheless become misleading due to subsequent events. *In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1245 (3rd Cir.1989) (duty exists to correct prior true statements if they become misleading due to subsequent events); *accord, Kirby v. Cullinet Software, Inc.*, 721 F.Supp. at 1450 (corporation has duty to update prior public statement that, although correct when issued, becomes misleading because of subsequent events).[36] In *Backman*, the First Circuit issued a cautionary endorsement of this view in dicta by stating that "in special circumstances, a statement, correct at the time, may have a forward looking intent and connotation upon which parties may be expected to rely. If this is a clear meaning, and there is a change, correction, more exactly, further disclosure, may be called for." *Backman v. Polaroid*, 910 F.2d at 17.

■ It should be noted that the Mid-Year Estimate, a subsequent event, predicted dramatically lower earnings per share in comparison to the 1985 Budget and in comparison to the public statement of November 29, 1984. Accordingly, although the November 29, 1984, statement was not, as a matter of law, untrue or misleading at the time it was made, there is a genuine issue of material fact as to whether the statement became misleading in light of the Mid-Year Estimate. Stated otherwise, in accordance with the *Kirby* decision, there is a genuine issue of material fact concerning whether M/A-Com had a duty to update the November 29, 1984, statement at the time the Mid-Year Estimate was distributed to senior management. Summary judgment in favor of M/A-Com is therefore appropriate up until the time of distribution of the Mid-Year Estimate to senior management.[37]

■ The second statement occurred on February 28, 1985, at the annual shareholders' meeting. Defendant DiBona, despite contrary figures contained in the Mid-Year Estimate, reiterated the forecast of 20% to 30% earnings growth. Unlike the first statement, this prediction proved to be false, albeit only by a small amount. This court finds a genuine issue of material fact exists as to whether this disclosure was material, that is, whether the statement altered the total mix of facts available to M/A-Com investors. M/A-Com also argues it is entitled to summary judgment on the basis of scienter.

■ Scienter is generally defined as "an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381; 47 L.Ed.2d 668 (1976). While predictions are, by their nature, uncertain, "materially misleading predictions made with scienter are actionable." *Kirby v. Cullinet Software, Inc.*, 721 F.Supp. at 1449. Moreover, it is not enough for plaintiffs to allege corporate mismanagement. Mismanagement or poor business judgment in coping with a downturn in the economy or in the particular industry does not create liability under Rule 10b-5. Rather, there must be the element of deception or scienter. *Greenberg v. Howtek, Inc.*, 790 F.Supp. 1181, 1187 (D.N.H.1992).

In *Cook v. Avien, Inc.*, 573 F.2d 685 (1st Cir.1978), the First Circuit assumed without deciding that recklessness would satisfy the scienter requirement. *See Lavery v. Kearns*, 792 F.Supp. 847, 869 & n. 23 (D.Me.1992) (noting that in *Cook* the First Circuit assumed the applicability of recklessness and stating that the First Circuit "appears likely" to adopt a recklessness standard "when the

---

sion. The actual result was on target to meet the higher projected figure of $1.15.

36. Generally, there is no liability to disclose material information absent a duty to disclose. *Chiarella v. United States*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). A duty to disclose arises (1) when a corporate insider trades on confidential information; (2) when a corporation has made inaccurate, incomplete or misleading prior disclosures; and (3) when a statute or regulation requires disclosure. *Greenberg v.*

*Howtek, Inc.*, 790 F.Supp. 1181, 1187 (D.N.H. 1992) (citing *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 26–27 (1st Cir.1987)); *see also Milton v. Van Dorn Company*, 961 F.2d 965, n. 4 (1st Cir.1992) (where a complaint alleges a material omission, the omission must not only be material but there must be a duty to disclose).

37. The parties are instructed to confer as to the particular time of distribution of the Mid-Year Estimate.

issue is squarely presented"); *Kirby v. Cullinet Software, Inc.*, 721 F.Supp. at 1449 (discussing scienter and assuming recklessness, in light of parties agreement, would suffice under Rule 10b-5). Given the recent trend to dismiss cases alleging merely lack of business judgment, however, *see Greenberg v. Howtek, Inc.*, 790 F.Supp. at 1187 (noting trend); *Shields v. Amoskeag Bank Shares, Inc.*, 766 F.Supp. 32, 38 (D.N.H.1991) (collecting cases); this court hesitates in adopting a recklessness standard.

Predictions, as in the case at bar, must at a minimum be "made in good faith and with a sound historical or factual basis." *Kirby v. Cullinet Software, Inc.*, 721 F.Supp. at 1450. A prediction therefore implies a "reasonable method of preparation and a valid basis." *Id.* at 1450. M/A–Com relies on certain affidavits by Bothwell and the individual defendants that the statements were made in good faith and without an intent to deceive. Although uncontradicted affidavits of good faith may suffice to rebut a plaintiff's scienter allegation and permit entry of summary judgment in favor of a defendant, *Bryson v. Royal Business Group*, 763 F.2d 491, 494 (1st Cir.1985), the record before this court is not uncontradicted.

It is true, as M/A–Com argues, that the 1985 Budget supports the second statement in which defendant DiBona projected a 20% to 30% earnings growth. The Mid–Year Estimate, available at or near the time of the shareholders meeting, however, provided contrary figures.[38] In 1984, the budget proved a reliable predictor of second quarter earnings but failed to accurately predict third and fourth quarter earnings. Whether the 1985 budget constituted a reasonable basis in fact, in the face of the more recent Mid–Year Estimate, for defendant DiBona to make the second statement is therefore a genuine issue of material fact. The time of defendant Di-

Bona's receipt of the Mid–Year Estimate is also a genuine issue of material fact.

As noted *supra*, between March 10 and 13, 1985, Bothwell made the third allegedly misleading statement. In making this statement, Bothwell relied on financial results in 1984 and certain documents and conversations with senior management. Whether it was reasonable for Bothwell to rely on financial results obtained in 1984 in the face of the more recent 1985 Mid–Year Estimate creates a material issue of fact, despite his averments to the contrary.[39]

On May 21, 1985, defendant DiBona made the fourth allegedly misleading statement by reiterating the 20% to 30% earnings growth at a meeting of security analysts. In light of the April estimate and figures contained in the Mid–Year Estimate, this court similarly finds a genuine issue of material fact regarding whether defendant DiBona had a reasonable basis to make this projection. Again the issue is close and weighs in favor of M/A–Com. This court nevertheless prefers the jury to make this determination and cannot, at this juncture, find in favor of M/A–Com as a matter of law.

Turning to the fifth allegedly misleading statement, defendant DiBona revised M/A–Com's earnings downward to a range of $1.00 to $1.05 on September 13, 1985. In doing so, he relied on reports issued by security analysts, a potential sale of shares to Argo and conversations with management personnel. (Docket Entry # 526). Given the recent June, July and August estimates, however, this court finds a genuine issue of material fact exists as to whether there was a reasonable basis for this projection.[40]

In sum, this court finds genuine issues of material fact exist concerning the elements of scienter and materiality with regard to the second, third, fourth and fifth allegedly mis-

---

38. As noted above, defendant DiBona could not recall exactly when he received the Mid–Year Estimate. (No Docket Entry Number Assigned, Volume I of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 2, pp. 57–58 & 65).

39. As with the second statement, the issue is close and weighs in M/A–Com's favor.

40. Again, although the record favors M/A–Com, it is not the province of this court to inquire into the weight of the evidence in a motion for summary judgment. Rather, this court must determine the existence or nonexistence of a genuine issue of material fact.

leading statements. With respect to the first statement, this court finds no genuine issue of material fact until there arose a duty to update this statement in light of the contrary figures contained in the Mid–Year Estimate.[41]

## II. MOTION OF DEFENDANT PAUL F. BRAUNEIS FOR SUMMARY JUDGMENT (DOCKET ENTRY # 487)

Defendant Brauneis moves for summary judgment as to Count I in the Amended Complaint, premised on a violation of Rule 10b–5, and Count II in the Amended Complaint, premised on "control person" liability under Section 20. (Docket Entry # 487). By Order dated August 27, 1990 (Docket Entry # 403), the court allowed Defendant Brauneis' Motion to Dismiss Amended Complaint (Docket Entry # 195D) with respect to allegations contained in Count I with the exception of allegations brought in paragraph 55.[42]

Allegations in paragraph 55 concern three interim reports[43] issued during the class period over defendant Brauneis' signature. In ruling on a motion to dismiss for failure to comply with Rule 9(b), Fed.R.Civ.P., the court construed these allegations as alleging nondisclosures of facts and perceptions of the future, rather than affirmative misrepresentations. (Docket Entry # 403, pp. 18 & 23). The court also denied the motion to dismiss with respect to Count II.

Accordingly, defendant Brauneis seeks summary judgment with regard to the remaining allegations in paragraph 55 concerning his alleged failure to disclose M/A–Com's internal financial difficulties. Defendant Brauneis also seeks summary judgment regarding his liability as a control person in Count II.

41. In light of this court's disposition of M/A–Com's motion for summary judgment, the parties are instructed to confer concerning the appropriate period of time to shorten the date of the beginning of the class period and advise this court of the status of shortening the time period to the time when them Mid–Year Estimate was disseminated on or before October 30, 1992. *See In re One Bancorp Securities Litigation*, 136 F.R.D. 526, 533 (D.Me.1991) (court retains discretion, acting *sua sponte* or on motion, to redefine proposed class).

42. Paragraph 55 reads as follows:
In each of the interim reports to shareholders dated December 29, 1984, February 11, 1985; March 30, 1985, May 13, 1985; June 29, 1985 and August 9, 1985, all over the signature of Brauneis, it is pointed out that sales, net income and stockholders (sic) equity increased over prior periods and no reference or indication is made concerning problems and operations which might require substantial inventory writedowns, discontinuance of certain operations, areas of poor productivity, and the need to restructure and spin off operations. (Docket Entry # 129C, ¶ 55).

43. A close reading of paragraph 55 and the punctuation differentiating the dates of the reports, demonstrates that plaintiffs refer to three as opposed to six interim reports. In opposing defendant Brauneis' motion for summary judgment (Docket Entry # 508), plaintiffs incorporate by reference prior pleadings without identifying the file date, docket entry number or title of these pleadings. On July 12, 1991, this court allowed plaintiffs leave to file a memorandum in excess of 20 pages. (Docket Entry # 426). On page 31 of this memorandum (No Docket Entry Number Assigned, received for filing on February 1, 1991, Plaintiffs' Memorandum in Opposition to Defendant Brauneis' Motion for Reconsideration of Motion to Dismiss or Alternatively Motion for Summary Judgment), plaintiffs clarify that the reports referred to in paragraph 55 refer to the following Form 10Q reports: (1) the 10Q report for the quarter ending December 29, 1984, and dated February 11, 1985; (2) the 10Q report for the quarter ending March 30, 1985, dated May 13, 1985; and (3) the 10Q report for the quarter ending June 29, 1985, dated August 9, 1985. (*Id.*, p. 31). Plaintiffs refer, again without identifying a document, to exhibits V, W and X as containing copies of these interim reports. Having located these exhibits (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. II, Ex. V, W & X), this court finds they correspond with the above mentioned dates. Although defendant Brauneis signed the exhibit copies of the reports dated February 11 and "August 9, 1984," the signature line for defendant Brauneis' signature is left blank in the report dated May 13, 1985. Furthermore, although plaintiffs refer to a report dated August 9, 1985, the report annexed in their exhibit is dated August 10, 1984. (*Id.*, Ex. V, W & X).

Defendant Brauneis, however, annexed correct copies of the reports to one of his affidavits. (Docket Entry # 490, Ex. D, E & F). He also averred that he signed the 10Q reports filed with the Securities and Exchange Commission. (*Id.*, ¶ 12).

As to paragraph 55, plaintiffs assert that defendant Brauneis signed interim reports which failed to reveal M/A–Com's internal problems. They argue that the reports were incomplete and that defendant Brauneis therefore had a duty to fully and accurately disclose information concerning M/A–Com's financial position.[44]

As to Count II, plaintiffs maintain that defendant Brauneis' role and ability to control M/A–Com constitutes a genuine and disputed issue of material fact. As Controller, defendant Brauneis was purportedly the "center" of M/A–Com's financial reporting. (Docket Entry # 508; p. 28).

## FACTUAL BACKGROUND

In February of 1985, M/A–Com filed a 10Q report dated February 11, 1985, with the Securities Exchange Commission ("SEC") for the quarter ending December 29, 1984. Defendant Brauneis signed this report. After conducting a limited review of M/A–Com's interim financial information, Price Waterhouse did not suggest any material modifications or additional disclosures. (*Id.*, Ex. W).

The February 11, 1985, report noted that net sales and income increased for the first quarter of FY 1985 when compared to the first quarter of FY 1984. The report also noted expenditure of $16.5 million in the first quarter and the necessity for continued investments in research and development. The report stated that "[t]he Company believes that its strong financial position combined with funds anticipated to be provided from operations as well as its available line of credit will be sufficient to satisfy the Company's near-term cash and working capital requirements." (*Id.*, Ex. V). The report also stated the amount of M/A–Com's working capital and M/A–Com's need to invest in items such as inventory and research and development. (*Id.*, Ex. V).

In May of 1985, M/A–Com filed a 10Q report dated May 13, 1985, with the SEC for the quarter ending March 30, 1985. Although the copy of the report provided to this court by plaintiffs does not include defendant Brauneis' signature, defendant Brauneis averred that he signed the report. (Docket Entry # 490, ¶ 12). By letter dated May 7, 1985, Price Waterhouse represented that it reviewed M/A–Com's interim financial information and proposed no additional disclosures. Similar to the February 11, 1985, report, this report noted increased net sales and income for the second quarter when compared to the second quarter of FY 1984. In addition to providing concrete figures of M/A–Com's working capital, M/A–Com also reiterated its belief that its strong financial position was sufficient to satisfy near-term cash and working capital requirements. (*Id.*, Ex. W).

In August of 1985, M/A–Com filed a 10Q report dated August 9, 1985, with the SEC for the quarter ending June 29, 1985. By letter dated July 30, 1985, Price Waterhouse represented that it reviewed M/A–Com's interim financial information and proposed no additional disclosures. In the 10Q report, M/A–Com repeated its belief that its strong financial position would satisfy near-term cash and working capital needs and noted the need for additional investments in accounts receivable, inventories and research and development. (Docket Entry # 490, Ex. F).

With respect to the above 10Q reports, Price Waterhouse never indicated to defendant Brauneis that the reports failed to comply with generally accepted accounting principles. Defendant Brauneis averred that he never knowingly or recklessly issued a financial statement containing false or misleading information. Defendant Brauneis also averred that, to his knowledge, the financial information contained in the 10Q reports was fairly presented. (Docket Entry # 490).

During the class period, defendant Brauneis was not a member of the Board of Directors of M/A–Com ("the board"). He did, however, attend a number of board meetings. (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for

---

**44.** This court assumes, *arguendo,* that plaintiffs have not abandoned this argument by stating that the core of their case constitutes the five public statements discussed in part I of this Memorandum and Order. (Docket Entry # 508, p. 4).

Summary Judgment by Defendant Paul F. Brauneis, Vol. III, Ex. 1, p. 102). He· also assisted in compiling M/A–Com's various internal financial reports. (*Id.*; Docket Entry # 417, ¶ 4). In FY 1985, defendant Brauneis was not an executive vice president · nor a member of the OOTP. (Docket Entry # 417, ¶ 3; Docket Entry # 490, ¶ 5).

Although the amount of M/A–Com shares owned by defendant Brauneis is unclear, he did not sell any shares of M/A–Com stock during the class period. (Docket Entry # 490, ¶ 18). As Vice President and Controller,[45] defendant Brauneis lacked the authority to decide whether M/A–Com would acquire assets, participate in joint ventures or raise capital. His duties consisted primarily of coordinating and assembling internal and external financial reporting and forecasting activities. (Docket Entry # 417, ¶ 4). Although during his deposition he did not recall specific information concerning the Mid–Year Estimate (No Docket Entry Number Assigned, No File Date Stamp, Affidavit of Fred T. Isquieth in Opposition to Motion for Summary Judgment by Defendant Paul F. Brauneis, Vol. III, Ex. 1, pp. 111–116), this court will assume, as argued by plaintiffs, that defendant Brauneis was aware of M/A–Com's internal financial condition during the class period.

## DISCUSSION

■ As discussed *supra,* a violation of Rule 10b–5 requires a materially misleading misrepresentation or omission. In lieu of identifying particular portions of the 10Q reports, plaintiffs generally allege that the reports note an increase in sales and net income but fail to refer to problems that might require inventory write downs or discontinuance or restructuring of operations. (Docket Entry # 129C, ¶ 55).

The statements concerning M/A–Com's financial strength, however, when viewed in the context of the entire reports, are simply not misleading as a matter of law. The reports were correct when issued and the statements regarding M/A–Com's strong financial position were couched in cautionary language and recognized the need for additional investment. *See In re Healthco International Inc., Securities Limited,* 777 F.Supp. 109, 114–115 (D.Mass.1991).

■ It is undoubtedly true that when a corporation does make a disclosure, whether voluntary or required, it has a duty to make the disclosure complete and accurate. *Roeder v. Alpha Industries, Inc.,* 814 F.2d 22, 26 (1st Cir.1987). Having reviewed these reports, this court finds that no reasonable investor would be misled. Summary judgment is therefore appropriate for defendant Brauneis with respect to allegations raised in paragraph 55.

■ This court now turns to defendant Brauneis' liability as a control person under Section 20. This section of the 1934 Act provides that:

(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Section 20 imposes joint and several liability on persons who control other persons who violate Rule 10b–5. *Federal Savings & Loan Insurance Corporation v. Shearson–American Express,* 658 F.Supp. 1331, 1343 (D.P.R.1987). Plaintiffs argue that defendant Brauneis, as a "controlling person," possessed the power to control the activities of M/A–Com, the alleged "controlled person."

■ Section 20 contains no express definition of "control." In the securities context control generally means "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of [an entity], whether through the

---

45. In 1985, defendant Brauneis received the title of Senior Vice President and Controller. (Docket Entry # 490, ¶ 2).

ownership of voting securities, by contract or otherwise." 17 C.F.R. § 230.405 (1990); *Sheinkopf v. Stone*, 927 F.2d 1259, 1270 (1st Cir.1991); *Seidel v. Public Service Company of New Hampshire*, 616 F.Supp. 1342, 1361 (D.N.H.1985).

■■■ "There is no question that a corporation's directors, officers and shareholders may be deemed 'controlling persons' " if they "dominated" the activities of the corporate entity. *Dowling v. Narragansett Capital Corporation*, 735 F.Supp. 1105, 1122 (D.R.I. 1990). Resolution of whether a defendant exercised control is oftentimes "a factual question that cannot be properly resolved by a motion to dismiss." *Id.* at 1122; *accord In re Rexplore, Inc. Securities Litigation*, 685 F.Supp. 1132, 1141 (N.D.Cal.1988) (denying motion to dismiss because issue was complex factual question). Presently facing this court, however, is a motion for summary judgment as opposed to a motion to dismiss.

■■■ There is a split among the circuits as to what elements plaintiffs must plead in order to establish a *prima facie* case under Section 20. To date, the First Circuit has not addressed this issue. Courts in the Eighth and Fifth Circuits do not require culpable participation, *see, e.g., G.A. Thompson & Company v. Partridge*, 636 F.2d 945, 958 (5th Cir.1981); *Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir.1985), *cert. denied*, 474 U.S. 1057, 1072, 106 S.Ct. 798, 832, 88 L.Ed.2d 774, 804 (1986), while courts in other circuits require some degree of culpable participation in the fraudulent acts in order to find liability. *See, e.g., Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440–1442 (9th Cir.1987); *Rochez Brothers, Inc. v. Rhoades*, 527 F.2d 880, 891 (3d Cir.1975); *Carpenter v. Harris, Upham & Company*, 594 F.2d 388, 394 (4th Cir.), *cert. den.*, 444 U.S. 868, 100 S.Ct. 143, 62 L.Ed.2d 93 (1979). As also noted by the court, defendant Brauneis' status as an officer of M/A–Com is ordinarily not enough to impose liability. (Docket Entry # 403, pp. 29–30).

■■■ In this district, the court in *Bray v. R.W. Technology, Inc.*, Fed.Sec.L.Rep. (CCH) ¶¶ 95,225, 95,977, 1990 WL 44084 (D.Mass. April 3, 1990), provided the following standard:

> In order to establish control person liability in general, plaintiff must show that the defendant actually participated in, or exercised control over, the operations of the corporation in general and had the power to control the specific transaction in question. It is unnecessary to show actual participation in the alleged securities law violation.

*Id.* at 95977.[46] In the absence of further guidance from the First Circuit, this court will therefore follow the *Bray* decision. While plaintiffs bear the burden of proof of showing control, defendant Brauneis bears the burden of proof of showing good faith. *See Federal Savings & Loan Insurance Corporation v. Shearson–American Express*, 658 F.Supp. at 1343 (discussing good faith).

Defendant Brauneis did not issue any of the five allegedly fraudulent statements discussed in part I of this Order. He averred that he did "not meet or speak with any securities analysts at any time during [the class period], nor did [he] have responsibility for communicating with security analysts." (Docket Entry # 490, ¶ 7). His immediate supervisor was defendant Burke who was an executive vice president during the class period. (Docket Entry # 417, ¶ 3; Docket Entry # 490, ¶ 5).

It is true that defendant Brauneis compiled various internal and external financial reports. It is also true that he coordinated M/A–Com's "forecasting activities." (Docket Entry # 490, ¶ 3). Coordinating and compiling material, however, are not the same as exercising control. In light of his duties, this court finds as a matter of law that he did not exercise control over M/A–Com nor have the power to control the five alleged misrepresentations concerning M/A–Com's projected growth. Summary judgment in favor of defendant Brauneis as to Count II is therefore appropriate:

---

46. The *Bray* court also noted that with respect to certain persons, such as directors, a plaintiff must show actual participation or some influence before imposing liability under section 20. *Id.* at 95,978.

## III. MOTION OF THE ESTATE OF THOMAS F. BURKE FOR SUMMARY JUDGMENT PURSUANT TO FED.R.CIV.P. 56 (DOCKET ENTRY # 485)

▆ Defendant Burke moves for summary judgment with respect to Count I and Count II of the Amended Complaint (Docket Entry # 129C). (Docket Entry # 485). In regard to Count I, defendant Burke argues that plaintiffs fail to present any evidence as to defendant Burke's scienter, an essential element of a Rule 10b–5 claim. In regard to Count II, defendant Burke maintains that, because there is no primary violation of Rule 10b–5 on the part of M/A–Com, there can be no secondary liability of defendant Burke under Section 20. (Docket Entry ## 486 & 515).[47]

Defendant Burke correctly points out that the Amended Complaint fails to contain a reference to any of his activities. Although plaintiffs' failure to particularize defendant Burke's role in the fraud, whether by tying defendant Burke to a particular misleading document which he signed, *Hurley v. Federal Deposit Insurance Corporation*, 719 F.Supp. 27, 32 (D.Mass.1989), or otherwise connecting him to the allegedly fraudulent acts, *see generally Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 119 (2d.Cir.1982) (discussing failure to plead scienter with particularity under Rule 9(b)), might support a motion to dismiss for failure to plead fraud with particularity under Rule 9(b), defendant Burke does not move for dismissal on this ground. Rather, he moves for summary judgment under Rule 56, Fed.R.Civ.P. Accordingly, this court first examines whether defendant Burke has met his initial burden of production.[48]

In answer to an interrogatory, defendant Burke stated that he did not become aware of any misrepresentations, material omissions or irregularities contained in M/A–Com's "financial statements." (Docket Entry # 515, No. 16). Defendant Burke also emphasized that Price Waterhouse conducted financial reviews and audits for M/A–Com during the period of defendant DiBona's employment[49] and approved of M/A–Com's accounting procedures. (Docket Entry # 477, ¶ 15). Defendant Burke further noted that, as averred by defendant DiBona, M/A–Com's 1984 Annual Report and quarterly 10K reports issued for FY 1984 satisfied general accounting standards. (Docket Entry # 490, ¶ 15).

Inasmuch as the "core" of plaintiffs' case does not rest on allegedly misleading financial statements but rather on five allegedly misleading public statements, these arguments are not particularly germane to the issue of the defendant Burke's scienter with respect to the five public statements.[50]

What perhaps is most troubling in regard to defendant Burke's scienter with respect to the first statement is that he did not attend the November 29, 1984, security analysts' meeting where defendant DiBona made this allegedly misleading public statement. (Docket Entry # 515, Ex. D). Defendant Burke also stated that he did not discuss the substance of defendant DiBona's statements with defendant DiBona either before or after the meeting. (*Id.*). Defendant Burke therefore meets his initial burden with respect to his scienter concerning the first statement.

---

47. Defendant Burke's memorandum is docketed twice.

48. In his memorandum, defendant Burke incorporates by reference arguments:

> set forth in M/A–Com's supporting memorandum and the several affidavits and other documents filed therewith. Burke also adopts the arguments made by defendant Richard T. DiBona in his memorandum and affidavit, which he filed in support of his motion for summary judgment as well as the motions of the other defendants, including Burke.

(Docket Entry # 515, p. 1). Although defendant Burke may incorporate by reference pursuant to Rule 10(c), Fed.R.Civ.P., a significant number of the arguments contained in the memoranda of M/A–Com and the other individual defendants are not relevant to the issue of defendant Burke's scienter. To the extent defendant Burke incorporates arguments raised by M/A–Com, this court refers defendant Burke to part I of this Order and, in particular, this court's discussion of M/A–Com's duty under Rule 10b–5.

49. This period overlapped the class period.

50. Defendant Burke also refers to M/A–Com's first set of interrogatories without citing where this document is located. Nor can this court locate such an exhibit.

■ Plaintiffs argue that defendant Burke's position and duties in M/A–Com provide sufficient evidence to establish that defendant Burke knew or should have known that the public statements were false and made without a reasonable basis. During the class period, defendant Burke served as Executive Vice President, Administration and Finance (Docket Entry # 490, ¶ 5) [51] and was a member of the Board of Directors. (Docket Entry # 417, ¶ 3). He was also a member of the OOTP and of the Strategic Council.[52] As noted *supra*, members of the OOTP received monthly narrative reports. Senior management received Red Books on a monthly basis and Blue Books on a quarterly basis.

This court, however, remains unconvinced. Inasmuch as plaintiffs fail to present specific facts regarding this issue, this court finds no genuine issue of material fact with respect to defendant Burke's scienter concerning the first statement.

■ Defendant Burke stated, however, that he attended the February 28, 1985, annual shareholders' meeting wherein defendant DiBona reiterated his belief of M/A–Com reaching a 20% to 30% growth in earnings. It is not clear whether defendant Burke was aware of the Mid–Year Estimate or other contrary internal figures at this time. Whether the 1985 budget constituted a reasonable basis in fact for this prediction, as noted *supra*, is a genuine issue of material fact. This court therefore finds that defendant Burke's scienter with respect to this statement and the remaining public statements are genuine issues of material fact

which preclude summary judgment at this time.[53] Defendant Burke's motion for summary judgment is therefore allowed with respect to the first public statement and denied as to the remaining four public statements.

■ Turning to Count II, defendant Burke argues that, without a primary violation of Rule 10b–5 on the part of M/A–Com, he cannot be held liable under Section 20. This argument is well taken. Section 20 liability requires the existence of a securities law violation. *Haft v. Eastland Financial Corporation,* 755 F.Supp. 1123, 1133 (D.R.I. 1991). The insufficiency of the allegations against M/A–Com concerning the November 29, 1984, statement requires summary judgment as to the control person claim against defendant Burke to the same extent. *See Berlinger v. Lotus Development Corporation,* 783 F.Supp. 708, 712–713 (D.Mass.1992) (dismissal of primary violation necessitated dismissal of control person claims). Summary judgment is therefore allowed as to defendant Burke's liability as a control person under Section 20 to the extent that this court allowed M/A–Com's motion for summary judgment. Summary judgment as to Count II is otherwise denied.

## IV. MOTION OF RICHARD T. DIBONA FOR SUMMARY JUDGMENT (DOCKET ENTRY # 476)

■ Defendant DiBona moves for summary judgment as to allegations in Count I that he violated Rule 10b–5 and allegations in Count II that he is liable as a "control person" under Section 20. (Docket Entry ## 476, 518 & 522).[54] In regard to Count I,

---

51. Defendant Burke is also identified as Executive Vice President and a Director of M/A–Com. (Docket Entry # 417, ¶ 3).

52. The Strategic Council consisted of defendant DiBona, Brand, Frank M. Drendel ("Drendel") and John G. Puente ("Puente"). (Docket Entry # 490, ¶ 5). During the class period, Drendel was a director and held the title of Executive Vice President. (Docket Entry # 436, pp. 4–5). Puente held the titles of Executive Vice President of M/A–Com and President of M/A–Com Development Corporation. (Docket Entry # 482, ¶ 2). A copy of Puente's original affidavit which does not contain an original signature is incorrectly docketed. (Docket Entry # 493).

53. Defendant Burke claims he did not attend the March 10 to 13, 1985, seminar. (Docket Entry # 515). As documentary support, defendant Burke refers this court to "ATI, at 48." As noted previously, M/A–Com's answers to plaintiffs' first set of interrogatories are not contained in the record. Defendant Burke admits that he attended the May 21, 1985, meeting of security analysts but cannot remember the forecast of 20% to 30% earnings growth. (Docket Entry # 515, Ex. E).

54. Defendant DiBona's memorandum in support, filed January 27, 1992, appears to be a copy and is not docketed. His corrections, filed on January 27, 1992, are docketed. (Docket Entry # 518). In order to prevent further delay, this

defendant DiBona argues that the record is devoid of evidence that he acted with the requisite intent to deceive.

As noted *supra*, the absence of scienter constitutes a dispositive ground for summary judgment. *Bryson v. Royal Business Group*, 763 F.2d 491, 493 & n. 3 (1st Cir. 1985). Defendant DiBona argues that he spoke accurately and completely and that any projections he made had a reasonable basis in historical fact. (No Docket Entry Number Assigned, Memorandum of Richard T. DiBona in Support of His Motion for Summary Judgment, filed January 27, 1992). He further contends that he had no duty to disclose additional information, even if material, inasmuch as he possessed no material information that would make prior disclosures inaccurate. (*Id.*).

For reasons stated in part I of this Memorandum and Order, this court disagrees. Genuine issues of material fact exist as to whether defendant DiBona had a duty to update the first statement at the time of dissemination of the Mid–Year Estimate and whether there was a reasonable basis in fact for the remaining four statements.[55]

■ In addition, defendant DiBona does not recall when he received the Mid–Year Estimate. In particular, he stated that he did not recall whether he received the estimate before the annual shareholders' meeting. (No Docket Entry Number Assigned, Volume I of Exhibits to Richard T. DiBona's Motion for Summary Judgment, filed January 27, 1992, Ex. 2, pp. 57–58 & 64–65). Accordingly, the time of dissemination of the

Mid–Year Estimate to defendant DiBona and other M/A–Com senior officers also presents a genuine issue of material fact.

Accordingly, for reasons stated in part I, defendant DiBona's motion for summary judgment is **ALLOWED** to the same extent as M/A–Com's motion for summary judgment and otherwise **DENIED.**

## V. CLASS PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 507)

Plaintiffs' move for summary judgment on each of the counts contained in the Amended Complaint. This court is mindful that its review of plaintiffs' motion for summary judgment is different than its review of M/A–Com's motion for summary judgment and the summary judgment motions of the individual defendants. Thus, this court must view the record in favor of the nonmoving parties, i.e., M/A–Com and the individual defendants. In addition, plaintiffs bear the ultimate burden of proof at trial.

■ As to Count I for violation of Section 10(b) and Rule 10b–5 on the part of M/A–Com and the individual defendants, the motion is **DENIED** for reasons stated in part I of this Memorandum and Order. This court finds genuine issues of material fact exist as to the duty to update the first statement at the time of dissemination of the Mid–Year Estimate to senior management and whether there was a reasonable basis in fact for the remaining statements.

court accepts the undocketed memorandum in support as properly before this court.

The undocketed memorandum in support, however, does not address defendant DiBona's liability as a control person under Section 20. The motion for summary judgment only states that he moves for summary judgment as to "Counts I and II of the Amended Complaint." (Docket Entry # 476). Although this court refers defendant DiBona to the discussion of defendant Brauncis' liability as a control person in part III of this Memorandum and Order, this court will not address defendant DiBona's liability as a control person absent a supporting memorandum. LR. 7.1.

**55.** This court is well aware of cases in the Seventh Circuit that hold that corporations "need

not disclose tentative internal estimates, even though they conflict with published estimates, unless the internal estimates are so certain that they reveal the published figures as materially misleading." *Wieglos v. Commonwealth Edison Company*, 892 F.2d 509, 516 (7th Cir.1989) (citing holding in *Panter v. Marshall Field & Company*, 646 F.2d 271, 291–293 (7th Cir.), *cert. den.*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981)). Again, although the evidence in the record weighs in favor of M/A–Com and the individual defendants, this court nevertheless finds a genuine issue of material fact concerning the duty to update the first statement at the time of dissemination of the Mid–Year Estimate and the existence of a reasonable basis for the remaining statements.

As to Count II for violation of control person liability under Section 20, the motion is also **DENIED** for reasons stated in parts I, II and III of this Memorandum and Order. Plaintiffs fail, at this juncture, to establish, as a matter of law, a primary violation on the part of M/A–Com.

## VI. JOINT MOTION OF DEFENDANTS TO STRIKE PLAINTIFFS' RULE 56.1 STATEMENT AND THE AFFIDAVIT OF FRED TAYLOR ISQUIETH (DOCKET ENTRY # 528)

■ M/A–Com and the individual defendants ("defendants")[56] move to strike plaintiffs' Rule 56.1 statement (Docket Entry # 510) and the affidavit submitted by Fred Taylor Isquieth (Docket Entry # 509). (Docket Entry # 528). At the June 19, 1992, hearing, defendants also noted that plaintiffs subsequently filed an annotated Rule 56.1 statement (Docket Entry # 541).

Plaintiffs' first Rule 56.1 statement is 128 pages in length. Plaintiffs' second annotated version is 317 pages in length. Although this court realizes and appreciates the efforts undertaken to compile this document, it goes without explanation that these documents are not concise. The documents also contain numerous statements of facts which are not material. *See generally In re Atlantic Financial Management, Inc. Securities Litigation,* 718 F.Supp. 1003, 1006–1007 (D.Mass. 1988) (discussing failure to comply in a securities case with local rule requiring concise statement of material facts to which "moving party contends there is no genuine issue to be tried"). In part I of this Memorandum and Order this court noted repeated instances in which plaintiffs' annotated Rule 56.1 statement failed to contain accurate references to the record.

Both statements therefore directly contravene the express provisions of LR. 56.1 which reads as follows:

> Motions for summary judgment shall include a concise statement of the material

facts of record as to which the moving party contends there is no genuine issue to be tried, with page references to affidavits, depositions and other documentation. Failure to include such a statement constitutes grounds for denial of the motion ... Copies of all referenced documentation shall be filed as exhibits to the motion or opposition.

This court notes, however, that in making its rulings on the motions for summary judgment, this court did not rely on plaintiffs' first Rule 56.1 statement.

Plaintiffs' first Rule 56.1 statement is **STRICKEN** for failure to comply with LR. 56.1. To the extent this court relied on annotated paragraphs contained in plaintiffs' second Rule 56.1 statement, it did so on the basis of support in the record.[57] To the extent this court did not rely on particular paragraphs contained in plaintiffs' annotated Rule 56.1 statement, these paragraphs are **STRICKEN** for failure to comply with LR. 56.1. Although LR. 56.1 provides that plaintiffs' noncompliance "constitutes grounds for denial of the motion," this court has already denied plaintiffs' motion for summary judgment on other grounds.

■ Turning to the affidavit of Fred Taylor Isquieth ("Isquieth"), Rule 56(e), Fed. R.Civ.P., expressly requires that affidavits be based on personal knowledge. An examination of the affidavit at issue (Docket Entry # 509), demonstrates that it is nothing more than a recitation of plaintiffs' first Rule 56.1 statement. Isquieth, as plaintiffs' attorney of record, lacks the requisite personal knowledge. The "affidavit" is therefore is "nothing more that [sic] a mere allegation, not entitled to credence or weight in the summary judgment calculus." *Sheinkopf v. Stone,* 927 F.2d 1259, 1269 (1st Cir.1991) (affidavit made upon information and belief in securities case failed to comply with Rule 56(e)). As such, the Isquieth affidavit (Docket Entry # 509) is **STRICKEN** from the record.

---

56. See footnote number 3.

57. To the extent this court relied on paragraphs in plaintiffs' annotated Rule 56.1 statement as unchallenged, defendants are invited to come

forward with specific evidence and citations to the record that this reliance is misplaced within 14 days of the date of this Memorandum and Order.

In accordance with the foregoing discussion, defendants' motion to strike (Docket Entry # 528) is **ALLOWED** in part and **DENIED** in part.

VII. MOTION OF CLASS PLAINTIFFS TO STRIKE THE RESPECTIVE MOTIONS OF EACH OF THE DEFENDANTS FOR SUMMARY JUDGMENT (DOCKET ENTRY # 511) and MOTION TO STRIKE DEFENDANTS' SUPPLEMENTAL RULE 56.1 STATEMENT IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT (DOCKET ENTRY # 539)

Plaintiffs move to strike defendants' motions for summary judgment on the grounds that defendants' statements fail to comply with LR. 56.1. (Docket Entry # 511). Plaintiffs additionally move to strike defendants' supplemental Rule 56.1 statement on the grounds of noncompliance with LR. 56.1. (Docket Entry # 539).

This court will not reiterate its discussion in Part VI of this Memorandum and Order ("Part VI") concerning LR. 56.1. Although defendants' Rule 56.1 statements (Docket Entry ## 491, 498 & 523)[58] contain references to the record, the statements are rather brief. M/A–Com's memorandum in support, however, contains numerous references to the record thereby assisting this court in deciphering the genuine issues of disputed material fact. (Docket Entry # 520).

As discussed in Part VI, plaintiffs' statements fail to comply with LR. 56.1. Fairness therefore dictates that this court consider the merits of all the motions for summary judgment. *See Kalp v. American National Can Company,* No. 90–C–4910, 1991 WL 111367 at *3, 1991 U.S.Dist. LEXIS, 8163 at * 8–9 (N.D.Ill. June 14, 1991) (in light of both parties' noncompliance with a local rule similar to LR. 56.1, court deemed that "fairness" necessitated addressing the merits of the summary judgment motions).

Plaintiffs' motions to strike (Docket Entry ## 511 & 539) are therefore **DENIED.**

CONCLUSION

In accordance with the foregoing discussion, this court makes the following rulings:

(1) Defendant M/A–Com, Inc.'s Motion for Summary Judgment (Docket Entry # 496) is **ALLOWED** in part and **DENIED** in part (see pages 258–59 *supra* ).

(2) Motion of Defendant Paul F. Brauneis for Summary Judgment (Docket Entry # 487) is **ALLOWED** with respect to Count I, paragraph 55, and with respect to Count II.

(3) Motion of the Estate of Thomas F. Burke for Summary Judgment Pursuant to Fed.R.Civ.P. 56 (Docket Entry # 485) is **ALLOWED** with respect to Count I as to the first statement and **DENIED** with respect to Count I as to the remaining four statements. With respect to Count II, the motion is **ALLOWED** to the same extent this court allowed M/A–Com's motion for summary judgment (Docket Entry # 496) and otherwise **DENIED.**

(4) Motion of Richard T. DiBona for Summary Judgment (Docket Entry # 476) is **ALLOWED** to the same extent this court allowed M/A–Com's motion for summary judgment (Docket Entry # 496) and otherwise **DENIED.**

(5) Class Plaintiffs' Motion for Summary Judgment (Docket Entry # 507) is **DENIED.**

(6) Joint Motion of Defendants to Strike Plaintiffs' Rule 56.1 Statement and the Affidavit of Fred Taylor Isquieth (Docket Entry # 528) is **ALLOWED** in part and **DENIED** in part.

(7) Motion of Class Plaintiffs to Strike the Respective Motions of Each of the Defendants for Summary Judgment (Docket Entry # 511) and Motion to Strike Defendants' Supplemental Rule 56.1 Statement in Support of Defendants' Motions for Summary Judgment (Docket Entry # 539) are **DENIED.**

---

**58.** A courtesy copy of M/A–Com's first statement (Docket Entry # 471) is also docketed.